**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
      *Plaintiff-Appellee,*

    v.

NEWTON JAMES CANTRELL, SR.,
      *Defendant-Appellant.*

No. 03-30562

D.C. No.
CR-03-00027-SEH

UNITED STATES OF AMERICA,
      *Plaintiff-Appellee,*

    v.

ANGELA DANIEL WALKER,
      *Defendant-Appellant.*

No. 03-30563

D.C. No.
CR-03-00027-SEH

UNITED STATES OF AMERICA,
      *Plaintiff-Appellee,*

    v.

JACK V. COVERSUP,
      *Defendant-Appellant.*

No. 03-30565

D.C. No.
CR-03-00027-SEH

UNITED STATES OF AMERICA,
      *Plaintiff-Appellee,*

    v.

THERESA ANN WALKER,
      *Defendant-Appellant.*

No. 03-30567

D.C. No.
CR-03-00027-SEH

675

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

                    v.                          No. 03-30568

JEANINE LUCILLE RENZ,                           D.C. No.
          *Defendant-Appellant.*                CR-03-00027-SEH

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

                    v.                          No. 04-30026

JAMES DANIEL MURPHY,                            D.C. No.
          *Defendant-Appellant.*                CR-03-00027-SEH

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*                 No. 04-30028

                    v.                          D.C. No.
                                                CR-03-00027-SEH
DONNA SHAWL CANTRELL,
          *Defendant-Appellant.*                OPINION

Appeals from the United States District Court
for the District of Montana
Sam E. Haddon, District Judge, Presiding

Argued and Submitted
June 13, 2005—Seattle, Washington

Filed January 13, 2006

Before: Harry Pregerson, Susan P. Graber, and
Ronald M. Gould, Circuit Judges.

Opinion by Judge Gould

**COUNSEL**

Palmer A. Hoovestal, Helena, Montana, for defendant-appellant Newton J. Cantrell.

Daniel P. Buckley, Bozeman, Montana, for defendant-appellant Angela D. Walker.

Mark D. Meyer, Great Falls, Montana, for defendant-appellant Theresa A. Walker.

J. Mayo Ashley, Helena, Montana, for defendant-appellant Jack P. Coversup.

James B. Obie, Helena, Montana, for defendant-appellant Jeanine L. Renz.

Marcia K. Hurd, Assistant United States Attorney, Billings, Montana, for the plaintiff-appellee.

---

**OPINION**

GOULD, Circuit Judge:

Newton Cantrell ("N. Cantrell"), Angela Walker ("A. Walker"), Theresa Walker ("T. Walker"), Jack Coversup ("Coversup"), and Jeanine Renz ("Renz") challenge the sentences they received as a result of their jury convictions for conspiracy to distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and 846, and other related charges. N. Cantrell argues that his sentence is unconstitutional in light of the Supreme Court's decision in *United States v. Booker*, 125 S. Ct. 738 (2005), which rendered the federal Sentencing Guidelines advisory. A. Walker, T. Walker, Coversup, and Renz assert that the district court misapplied the Guidelines in imposing their sentences. We have jurisdiction under 28 U.S.C. § 1291, and we affirm in part and remand in part.

# I

In 1997, law enforcement officials from the Federal Bureau of Investigation and local and tribal police departments launched a five-year investigation of N. Cantrell, his wife, Donna Cantrell ("D. Cantrell"), their daughters, T. Walker and A. Walker, and various of their relatives and friends who were believed to be involved in a conspiracy to distribute methamphetamine and marijuana in and around the Fort Peck Indian Reservation and northeastern Montana. N. Cantrell, Coversup, T. Walker, Renz, Murphy, and A. Walker were eventually arrested and indicted for narcotics and firearms offenses, including a charge of "knowingly and unlawfully conspir[ing] to distribute 500 grams or more of . . . methamphetamine . . . in violation of Title 21 U.S.C. § 841(a)(1), all in violation of Title 21 U.S.C. § 846." They pled not guilty and proceeded to trial, where all the defendants, with the exception of Coversup, were convicted by a jury on the methamphetamine conspiracy charge. The jury acquitted Coversup of the methamphetamine conspiracy charge, but found him guilty of "possessi[on] with intent to distribute less than 50 grams of methamphetamine."

After trial the district court conducted sentencing proceedings for each defendant.

The district court held an evidentiary hearing for N. Cantrell and then attributed him with 15 kilograms or more of methamphetamine for a base offense level of 38. The district court also found that N. Cantrell was a leader in the drug conspiracy and applied a two-level enhancement under U.S.S.G. § 3B1.1(c). Based on this total offense level of 40, N. Cantrell received 330 months of imprisonment for his drug offenses and 60 months for his conviction on a firearm charge, for a total sentence of 390 months, followed by 5 years of supervised release.

A. Walker objected to the Presentence Report ("PSR") prepared by the probation office, which attributed to her 350 to

500 grams of methamphetamine, and calculated her base offense level as 30. A. Walker argued that the proper base offense level was 24, based on a drug quantity of between 40 and 50 grams of methamphetamine and that she was entitled to a § 3B1.2(b) two-level downward adjustment for her minor role in the offense. The government in turn offered testimony from Mario Morales ("Morales") to establish that the drug quantity attributable to A. Walker was at least 1.5 but less than 5 kilograms and that the proper base offense level was 34.

Morales testified that from about 1998 to 2002, he had acted as a drug trafficking middleman, selling narcotics on behalf of some drug suppliers to the Cantrells. He reported that the Cantrells had initially purchased a pound of methamphetamine and two pounds of marijuana every six weeks, but that by 2002 they had increased the quantity and frequency of their purchases to two pounds of methamphetamine and two pounds of marijuana every two weeks. The Cantrells paid Morales $500-$600 for his go-between services, and the suppliers gave him narcotics for his personal use.

Morales testified that A. Walker accompanied D. Cantrell on several occasions when D. Cantrell came to his residence in Wapato, Washington, to pick up drugs. He also testified that A. Walker was present when the purchase money was exchanged.

During his cross-examination of Morales, A. Walker's defense counsel questioned Morales about his substance abuse, and how drugs might have affected his memory. Over the government's objection, A. Walker's counsel was also allowed to impeach Morales with allegedly inconsistent statements Morales earlier had made to the police about the identity of individuals who had come to his house, and about whether he had received money from the drug suppliers for acting as the middleman between them and the Cantrells.

A. Walker's counsel then pressed Morales to give him an "accurate" answer as to the number of times A. Walker had come on a drug pick-up, and Morales responded that she had come five or six times, even while admitting that he might have previously told law enforcement it was "four, five, or six times."[1] The government eventually objected to the repetitive questioning, and the district court sustained the objection, stating that it would make a determination about the number

---

[1]The following testimony was given:

Q: How many times did you meet Angie?

A: Probably about — I'm going to say — say, at the most six times.

Q: Well, Mr. Morales, that's — This is an important question. I'm asking you not to guess or speculate.

A: Well, I'm going to say six times then.

Q: When you say, "I'm going to say six times," it leaves me with the impression that —

THE COURT: Wait a minute. Wait a minute, counsel. We don't need your comments on your view of the evidence. Just ask questions, please.

Q: When you were interviewed by [law enforcement] did you also tell [them] six times?

A: I said five or six times, four, five, or six times. But I'm — It's — It's — I'd say six times.

Q: If you told [law enforcement] something other than six times, and that's reflected in the report, would the report be inaccurate, or would the report be accurate?

[objection by prosecution, question withdrawn by defense]

Q: If I represent to you that the report says five times, and you're now saying six times, can you be sure that either one is correct?

PROSECUTION: Your Honor, I'm going to object. We are repeating this line of questioning over and over. The court can look at his testimony and make a decision. He has said five to six times.

THE COURT: Yes. I'll make a determination about this.

of trips made by A. Walker based on the testimony already in the record.

A. Walker's counsel returned to his earlier line of questioning, asking Morales about specific details of the trips made by A. Walker, such as the quantity of drugs purchased and whether A. Walker had arranged any of the purchases. The government objected on the ground that defense counsel was eliciting testimony cumulative of testimony already in the record, and the district court responded by telling defense counsel:

> [W]e do need to stick to the issues here. This court is, I'm satisfied, able to make a determination about the credibility of this witness. And the essential issue before this court is the quantity of drugs to be attributed to this defendant. And insofar as this witness's testimony is concerned, it appears to the court that the essential issues are how many times did she come there to get drugs and what was the quantity of drugs obtained on each occasion. Beyond that, the other matters that have been asked about go to credibility, for all practical purposes.

When counsel protested that he needed to explore "[i]f there is an occasion that [Morales] cannot recall . . . or if there's an occasion that is iffy in [Morales's] mind," the district court asked Morales directly about the purpose of A. Walker's visits and the drug quantities obtained on the visits:

> THE COURT: Well, let's just ask the man: Did these people ever come to your house, that is, Angela Walker, did she ever come to your house on an occasion when they did not pick up drugs?
>
> A: No.

THE COURT: And how much was the least quantity of methamphetamine picked up on any one of these occasions that Angela Walker came to your house?

A: The least would be one pound.

THE COURT: All right. I think we have those two matters established, counsel.

A. Walker's counsel continued to protest that he "want[ed] to make sure that [Morales] c[ould] recall every single time that he's saying — maybe five, maybe six, because it makes a difference. It's 440 grams every time he says that." The district court agreed to allow counsel to inquire about the number of visits with the caveat that counsel limit his inquiry to that issue and not go "back into what is clear on this record."

Despite the district court's instruction, A. Walker's counsel questioned Morales about what had happened on each of A. Walker's visits to Morales's house rather than the number of visits A. Walker had made. The government objected, and the district court again explained to A. Walker's counsel that: (1) it was satisfied that it could make a determination as to Morales's credibility "on the basis of the record that's already been presented to [the district] court today, plus four other times that [Morales] ha[d] appeared before [the district] court under oath"; and (2) "[t]he only remaining issue about which there seems to be any dispute is whether she came on five occasions or six occasions."

Thereafter, A. Walker's counsel assured the court that he understood, but still did not alter his line of questioning. The government lodged its fourth objection and the district court told counsel that he would have to "move to another topic" unless he kept his "questions within the scope of the matter that the court ha[d] allowed [him] to address." A. Walker's counsel argued once more that it was necessary for him to establish whether each trip Morales had attested to had in fact

occurred because each trip meant another pound of methamphetamine would be attributed to his client. The district court informed counsel that he had one last opportunity to ask a direct question about the number of trips, and counsel asked Morales if there was any possibility that A. Walker had made less than five trips. When Morales said no, the district court ended the cross-examination.

In resolving the factual dispute over the drug quantity attributable to A. Walker, the district court stated that it had "taken into account the trial record of this case over which [it had] presided," and "the testimony of Mr. Morales, who testified under oath" at A. Walker's sentencing proceedings. The district court explained that it had found the information given by Morales to be reliable because there were no significant or meaningful discrepancies between his testimony and testimony provided by other witnesses at trial, and because Morales's testimony in other proceedings where he had testified under oath before the district court had also been consistent with the trial record in its essential components. The district court further noted that the jury had found A. Walker guilty of participation in the conspiracy and had attributed to her personally a minimum of 500 grams of methamphetamine.

The district court found that at least 1.5 but less than 5 kilograms of methamphetamine were attributable to A. Walker, for a base offense level of 34. After denying A. Walker's request for a minor role adjustment under § 3B1.2(b), the district court determined that the applicable Guidelines range was 151-188 months, and sentenced A. Walker to 165 months in prison, with five years of supervised release.

T. Walker objected at her sentencing hearing to her PSR, which found her responsible for 907.2 grams of methamphetamine, for a base offense level of 32. T. Walker argued that she should be held responsible for less than 50 grams of methamphetamine, and that the district court should use a base offense level of 24 in selecting her sentence. She also

argued that she was entitled to a § 3B1.2 minimal or minor role adjustment.

The government presented testimony from Morales to support the drug quantity and base offense level recommended in T. Walker's PSR. Morales testified that T. Walker had come to his house with her mother and sisters for drug pick-ups on three to four occasions, and that each pick-up involved "[a]t least one pound or two pounds of meth and two pounds of marijuana." He also testified that T. Walker was present when the purchase money was exchanged.

The district court found T. Walker responsible for 500 grams or more of methamphetamine, resulting in a base offense level of 32. The district court denied the requested § 3B1.2 downward adjustment, and sentenced T. Walker to 130 months in prison and 5 years of supervised release.

Coversup's PSR stated that he was not entitled to a § 3E1.1(a) downward adjustment for acceptance of responsibility, and recommended a base offense level of 24, with a two-point enhancement because Coversup possessed a weapon in the commission of his offenses, for a total offense level of 26. During his sentencing proceedings, Coversup objected to the statement in the PSR that he was ineligible for the acceptance of responsibility adjustment, and argued that he was also entitled to a four-level downward adjustment under § 3B1.2(a) for his minimal participation in the conspiracy. The district court rejected his contentions, and, using the recommended offense level of 26 and the resulting 63- to 78-month Guidelines range, gave Coversup a sentence of 71 months in prison with three years of supervised release.

Renz's PSR attributed between 50 and 200 grams of methamphetamine to Renz, but the district court found her responsible for 500 grams or more of the drug. Setting the base offense level at 32, the district court applied a two-level § 3B1.2(b) minor role in the offense reduction and a two-level

"safety valve" reduction pursuant to § 5C1.2 and 18 U.S.C. § 3553(f), for a total offense level of 28. Renz ultimately received a sentence of 92 months in prison and 5 years of supervised release.

The defendants timely appealed their convictions and sentences. We affirmed their convictions in a previously filed memorandum disposition, and address only their sentencing issues in this published opinion.

## II

**[1]** We begin by outlining the contours of the applicable sentencing regime in the aftermath of the Supreme Court's decision in *United States v. Booker*, 125 S. Ct. 738 (2005), which was decided while this consolidated case was pending on direct review. In *Booker*, the Supreme Court held that the use of extra-verdict factual findings to impose a sentence under the mandatory Guidelines violates the Sixth Amendment. *Id.* at 756. The Court remedied this constitutional violation by making the Guidelines advisory; the Court excised the provisions of the Sentencing Reform Act requiring sentencing courts to sentence within the applicable Guidelines range subject only to limited "departure" authority, 18 U.S.C. § 3553(b)(1), and appellate courts to review de novo the exercise of this departure power, *id.* § 3742(e). *See Booker*, 125 S. Ct. at 764-65 ("With these two sections [that make the Guidelines mandatory] excised . . . , the remainder of the Act satisfies the Court's constitutional requirements."); *United States v. Ameline*, 409 F.3d 1073, 1074, 1077-78 (9th Cir. 2005) (en banc). In place of de novo review, the Court instructed appellate courts to review sentences for "unreasonableness" in light of the sentencing factors in 18 U.S.C. § 3553(a). *See Booker*, 125 S. Ct. at 765-67.

Our court has since issued several opinions implementing the Supreme Court's mandates in *Booker*. First, in *Ameline*, we held

that when we are faced with an unpreserved *Booker* error that may have affected a defendant's substantial rights, and the record is insufficiently clear to conduct a complete plain error analysis, a limited remand to the district court is appropriate for the purpose of ascertaining whether the sentence imposed would have been materially different had the district court known that the sentencing guidelines were advisory.

409 F.3d at 1074.

Subsequently, in *United States v. Kimbrew*, we said that we would continue to address challenges to a district court's interpretation and application of the Guidelines, notwithstanding that the Guidelines are now effectively advisory, because the district courts, while not bound to apply the Guidelines, "should still consult them for advice as to the appropriate sentence." 406 F.3d 1149, 1152 (9th Cir. 2005) (citing *Booker*, 125 S. Ct. at 767). We also clarified in *United States v. Moreno-Hernandez* that the limited remands provided for in *Ameline* are available to defendants "in *all* pending direct criminal appeals involving unpreserved *Booker* error, whether [they implicate the Sixth Amendment or just the nonconstitutional error that the sentence was imposed under guidelines believed to be mandatory]." 419 F.3d 906, 916 (9th Cir.), *cert. denied*, 126 S. Ct. 636 (2005). With these principles in mind, we turn to the Guidelines-related issues arising from this consolidated appeal.

**A**

Although the defendants did not raise the issue of *Booker* error in the district court or on appeal, we ordered the parties to file supplemental briefs pursuant to *Ameline*, 409 F.3d at 1084 ("When faced with an unpreserved *Booker/Fanfan* error, the reviewing panel must first determine if an eligible party wants to pursue the subject."). With the exception of N. Can-

trell, all the defendants responded in the negative.[2] Thus, we review only N. Cantrell's case for plain *Booker* error. Because we conclude that "it is not possible to reliably determine from the record whether the sentence imposed [on N. Cantrell] would have been materially different had the district court known that the Guidelines were advisory, we will remand to the sentencing court." *Id.* Accordingly the district court will have the opportunity to decide in the first instance if it would have sentenced otherwise under a discretionary sentencing regime.

**B**

A. Walker, T. Walker, Coversup, and Renz do not argue that their sentences, imposed under a mandatory Guidelines system, violate *Booker*. Instead, they challenge only the district court's application of the Guidelines to their individual cases. Although these defendants do not assert *Booker* error, *Booker*'s remedial holdings apply to all cases pending on direct review. *See Booker*, 125 S. Ct. at 769. We therefore evaluate A. Walker, T. Walker, Coversup and Renz's timely challenges to the district court's application of the Guidelines in light of the new review procedures prescribed by *Booker*.

*Booker*'s mandate that appellate courts should review sentences for "reasonableness," 125 S. Ct. 765-67, applies only to our review of the ultimate sentence; after *Booker* we continue to review "the district court's interpretation of the Sentencing Guidelines de novo, the district court's application of the Sentencing Guidelines to the facts of [a] case for abuse of discretion, and the district court's factual findings for clear error." *Kimbrew*, 406 F.3d at 1151.

---

[2]D. Cantrell and James Murphy are co-defendants in this consolidated appeal, but we have no reason to review their sentences in this opinion because they responded that they did not want a remand under *Ameline*, and raised no other sentencing errors.

The government also responded that it would not seek an *Ameline* remand.

**[2]** If we determine that the sentence resulted from an incorrect application of the Sentencing Guidelines, and further that the error in application was not harmless, we will remand to the district court for further sentencing proceedings just as we would have under the pre-*Booker* sentencing regime. *See* 18 U.S.C. § 3742(f)(1); *Williams v. United States*, 503 U.S. 193, 202-03 (1992) (explaining that 18 U.S.C. § 3742(f)(1) requires remand if sentencing court misapplied Guidelines and error affected sentence imposed). We do not suggest that district courts are bound to sentence within the applicable Guidelines ranges when sentencing, because the Guidelines are now advisory. *Booker*, 125 S. Ct. at 764. Rather, we are stressing that district courts still "must consult [the] Guidelines and take them into account when sentencing," even though they now have the discretion to impose non-Guidelines sentences. *Id.* at 767 (citing 18 U.S.C. § 3553(a)(4), (5)).

**[3]** This continuing duty of district courts to consult the Guidelines is statutory. Although the Court in *Booker* excised the mandatory aspects of the Guidelines in 18 U.S.C. §§ 3553(b)(1) and 3742(e), it left the remainder of the Sentencing Reform Act intact to "function[ ] independently." *Id.* at 764. This means that 18 U.S.C. § 3553(a) is still operative, and requires district courts to take the applicable Guidelines range into consideration when sentencing, along with other sentencing factors enumerated by Congress.[3] *See Booker*, 125

---

[3]We do not here decide whether the district court must calculate the applicable Guidelines range in every situation. *See United States v. Crosby*, 397 F.3d 103, 112 (2d Cir. 2005) (describing circumstances in which the "precise calculation of the applicable Guidelines range may not be necessary") *abrogated on other grounds by United States v. Lake*, 419 F.3d 111, 113 (2d Cir. 2005). Rather, "to comply with *Booker*'s mandate that district courts 'take [the Guidelines] into account when sentencing,' courts normally must determine and consider the correct Guidelines range." *United States v. Menyweather*, No. 03-50496, 2005 WL 3440800, slip op. at 16488 (9th Cir. Dec. 16, 2005) (alteration in original) (quoting *Booker*, 125 S. Ct. at 767). We leave open the question whether, and under what circumstances, district courts may find it unnecessary to calculate the applicable Guidelines range.

S. Ct. at 764-65 ("Without the 'mandatory' provision, the Act nonetheless requires judges to take account of the Guidelines together with other sentencing goals." (citing § 3553(a))); *Ameline*, 409 F.3d at 1085-86 (addressing district court's procedural error in calculating defendant's base offense level because "the base offense level . . . remains the starting point for determining the applicable guideline range for an offense" even in the discretionary Guidelines system); *see also United States v. Mashek*, 406 F.3d 1012, 1016 n.4 (8th Cir. 2005) ("The appropriate guidelines range, though now calculated under an advisory system, remains the critical starting point for the imposition of a sentence under § 3553(a)."); *United States v. Crawford*, 407 F.3d 1174, 1178-79 (11th Cir. 2005) ("This consultation requirement [in § 3553(a) that survives *Booker*], at a minimum, obliges the district court to calculate *correctly* the sentencing range prescribed by the Guidelines. . . . In other words, as was the case before *Booker*, the district court must calculate the Guidelines range accurately. A misinterpretation of the Guidelines by a district court 'effectively means that [the district court] has not properly consulted the Guidelines.' " (quoting *United States v. Hazelwood*, 398 F.3d 792, 801 (6th Cir. 2005)) (alteration in original); *Hazelwood*, 398 F.3d at 801 ("[R]egardless of whether the Guidelines are mandatory or merely advisory, district courts are *required by statute* to consult them . . . ." (citing 18 U.S.C. § 3553(a)).

**[4]** Title 18 U.S.C. § 3742(a) and (f) have also survived *Booker*. Section 3742(a) provides for appeals by defendants and by the government "if the sentence . . . was imposed as a result of an incorrect application of the sentencing guidelines." Section 3742(f) requires a remand to the district court in the event the court of appeals determines that such misapplication error occurred. *See Mashek*, 406 F.3d at 1015 ("[Section] 3742(f) does not provide for a reviewing court to affirm a sentence based on its overall reasonableness when it was imposed as a result of an incorrect application of the guidelines. Instead, § 3742(f)(1) commands the reviewing court to remand a case where the district court incorrectly

applied the guidelines."); *United States v. Villegas*, 404 F.3d 355, 362 (5th Cir. 2005) (per curiam) ("The survival of [§ 3742(a) and (f)] counsels that we maintain our review of the district court's interpretation and application of the Guidelines when it has imposed a sentence under the Guidelines."). Accordingly, we hold that a material error[4] by the district court in calculating the applicable Guidelines range is grounds for resentencing, just as it was before *Booker*.

**[5]** If, on the other hand, our review leads us to conclude that the district court committed no error in applying the Guidelines, we will next consider challenges to the reasonableness of the overall sentence in light of all the 18 U.S.C. § 3553(a) factors, including the applicable Guidelines range. Stated another way, the new reasonableness standard of review established in *Booker* comes into play only if there was no material error in the district court's calculation of the appropriate Guidelines range. *See Kimbrew*, 406 F.3d at 1154 (vacating and remanding for resentencing based on Guidelines application error, without considering reasonableness of sentence).

In sum, our review of the district court's application of the Guidelines is the same as it was under the pre-*Booker* sentencing regime. If there was material error in the Guidelines calculation that serves as the starting point for the district court's sentencing decision, we will remand for resentencing pursuant to 18 U.S.C. § 3742(f), without reaching the question of whether the sentence as a whole is reasonable in light of § 3553(a). *See Kimbrew*, 406 F.3d at 1154. In the absence of Guidelines application error, however, we will then pro-

---

[4]As noted above, such application errors are still subject to harmless and plain error review. *See Booker*, 125 S. Ct. at 769; *Williams*, 503 U.S. at 202-03; *Menyweather*, slip op. at 16495 (recognizing that "any error would be harmless to the government in this case" because "the district court could—and would—impose the same sentence again under the now-advisory Guidelines regime"); *Mashek*, 406 F.3d at 1017; *Hazelwood*, 398 F.3d at 801.

ceed to address challenges to the reasonableness of the sentence.[5] *See generally Menyweather*, slip op. at 16488-89.

---

[5]The law in the circuits that have thus far addressed this issue is somewhat in disarray. The two-part review procedure we outline here, requiring our consideration of alleged Guidelines misapplication errors before we consider the reasonableness of the sentence in light of § 3553(a), is consistent with the procedures used by the Fifth, Sixth, Eighth and Eleventh Circuits. *See United States v. Gibson*, 409 F.3d 325, 338-39 (6th Cir. 2005) ("Once we conclude that the district court has properly consulted the Sentencing Guidelines, we review the sentence for reasonableness."); *Mashek*, 406 F.3d at 1016-17 (explaining that appellate court will only review sentence for reasonableness after determining that there was no error in district court's application of Guidelines); *Crawford*, 407 F.3d at 1179 ("[T]he district court must calculate the Guidelines range accurately. . . . After it has made this calculation, the district court may impose a more severe or more lenient sentence as long as the sentence is reasonable . . . ."); *Villegas*, 404 F.3d at 361-62 & n.7 (explaining that procedure used for reviewing sentences after *Booker* will be similar to two-step procedure used before *Booker* for reviewing Guidelines departures; reviewing court will inquire whether the Guidelines range was properly calculated before assessing whether the overall sentence was reasonable).

The Second and D.C. Circuits, however, review claims of error in the district court's application of the Guidelines as one factor in the course of reviewing the reasonableness of a sentence as a whole. *See United States v. Price*, 409 F.3d 436, 442-43 (D.C. Cir. 2005) (stating that review is for reasonableness and that "[i]n deciding whether a sentence is reasonable, we must also consider whether the District Court committed legal error. . . . A failure to follow the strictures of the Sentencing Guidelines is among the errors that might cause a sentence to be overturned on appeal"); *United States v. Selioutsky*, 409 F.3d 114, 118 (2d Cir. 2005) (stating that review is for reasonableness and that "[a]n error in determining the applicable Guideline range or the availability of departure authority would be the type of procedural error that could render a sentence unreasonable under *Booker*"). Finally, the Tenth Circuit has held that the reasonableness standard of review applies only to sentences imposed after *Booker*, under the newly discretionary sentencing scheme. *See United States v. Souser*, 405 F.3d 1162, 1165 (10th Cir. 2005) ("[R]eviewing [a sentence imposed before *Booker*] for reasonableness — a standard of review compatible only with the review of a discretionary decision below — is inappropriate.").

We now apply this two-step review procedure in addressing individual claims of Guidelines application error asserted by A. Walker, T. Walker, Coversup and Renz. Because the defendants have alleged only that the district court improperly applied the Guidelines, and did not raise any general reasonableness challenges after *Booker*, we do not reach the second step of the analysis, which would otherwise require a determination of whether the defendants' sentences are reasonable in light of § 3553(a). *See United States v. Mathijssen*, 406 F.3d 496, 498 (8th Cir. 2005).

**1**

A. Walker contends that the procedure employed by the district court in determining the quantity of methamphetamine attributable to her for the purpose of calculating her base offense level was erroneous and violated her due process rights. She also contends that the district court erred in refusing to grant her a minor participant downward adjustment under § 3B1.2(b) of the Guidelines. We reject both contentions.

[6] A. Walker argues that the district court violated her due process rights by precluding her from conducting "meaningful questioning" into the reliability of Mario Morales's testimony during her sentencing hearing. This assertion is unsupported by the record, which shows that A. Walker was permitted to make an extensive attack on Morales's reliability by inquiring about his drug use and about allegedly inconsistent statements he previously made to law enforcement. The district court only interjected to curtail cross-examination when it became apparent that A. Walker's repetitive questions were not adding anything to the existing record. *See United States v. Weiner*, 578 F.2d 757, 766 (9th Cir. 1978) (per curiam) (holding that a district court "in its discretion may limit cross-examination in order to preclude repetitive questioning, upon determining that a particular subject has been exhausted," even during the trial phase when defendants actually have a

constitutional right to confront witnesses and more extensive due process rights than they have at sentencing); *see also United States v. Adams*, 694 F.2d 200, 202-03 (9th Cir. 1982) (holding that sentencing court did not violate defendants' due process rights when it reasonably refused to recall a witness for cross-examination). Defense counsel kept inquiring about the same details of A. Walker's visits to Morales's home, and Morales's responses were always the same; Morales consistently stated that A. Walker had visited his house with D. Cantrell on five to six occasions, and that D. Cantrell would purchase a minimum of one pound of methamphetamine on each visit. Because the district court did not unreasonably restrict A. Walker's ability to test Morales's reliability through cross-examination, the question is whether the district court abused its discretion in determining that Morales's testimony was sufficiently reliable to satisfy the due process concern that a defendant not "be sentenced on the basis of materially incorrect information." *See United States v. Petty*, 982 F.2d 1365, 1369-70 (9th Cir. 1993), *amended by* 992 F.2d 1015 (9th Cir. 1993).

**[7]** Notwithstanding the evidence of Morales's substance abuse and the alleged discrepancies between his testimony at the sentencing proceedings and earlier statements he made to the police, the district court had an adequate basis for concluding that Morales's statements were sufficiently reliable. Morales's statements were given under oath, and much of his testimony relating to the details of the drug pick-ups made by A. Walker was corroborated by trial testimony from A. Walker's sister, Carmen Cantrell. Also, the district court pointed to the fact that Morales had testified reliably on previous occasions before the court. Given these facts, we hold that the district court did not abuse its discretion by relying on Morales's testimony. *See United States v. Johansson*, 249 F.3d 848, 857 (9th Cir. 2001) (holding that defendant's due process interests at sentencing were protected where district court allowed parties an opportunity to develop evidence and submit memoranda, and held an evidentiary hearing where both sides had

the opportunity to present witnesses and argue); *United States v. Chee*, 110 F.3d 1489, 1492-93 (9th Cir. 1997) (holding that evidence was sufficiently reliable because there was corroboration); *Petty*, 982 F.2d at 1369 (same).

A. Walker's second argument also fails because she has not met her burden of proving her entitlement to a § 3B1.2(b) minor participant adjustment. "Whether a defendant is a 'minor' or 'minimal' participant in the criminal activity is a factual determination subject to the clearly erroneous standard." *United States v. Sanchez*, 908 F.2d 1443, 1448-49 (9th Cir. 1990) (internal quotation marks omitted). "The defendant bears the burden of proving that he [or she] is entitled to a downward adjustment based on his [or her] role in the offense." *United States v. Awad*, 371 F.3d 583, 591 (9th Cir. 2004).

Section 3B1.2 instructs the district court as follows:

> Based on the defendant's role in the offense, decrease the offense level as follows:
>
> (a)   If the defendant was a minimal participant in any criminal activity, decrease by **4** levels.
>
> (b)   If the defendant was a minor participant in any criminal activity, decrease by **2** levels.
>
> In cases falling between (a) and (b), decrease by **3** levels.

U.S.S.G. § 3B1.2.

**[8]** While a comparison to the conduct of a hypothetical average participant may be appropriate in determining whether a downward adjustment is warranted at all, the relevant comparison in determining which of the § 3B1.2 adjustments to grant a given defendant "is to the conduct of co-

participants in the case at hand." *United States v. Petti*, 973 F.2d 1441, 1447 (9th Cir. 1992); *see also United States v. Johnson*, 297 F.3d 845, 874 (9th Cir. 2002) ("[A] defendant's culpability is to be measured against his co-participants, not a hypothetical 'average participant.' "). It is not enough that a defendant was less culpable than his or her co-participants, or even that he or she was among the least culpable of the group, because a minimal or minor participant adjustment under § 3B1.2 is available only if the defendant was "substantially" less culpable than his or her co-participants. *Id.* at 874 & n.37; *United States v. Benitez*, 34 F.3d 1489, 1497-98 (9th Cir. 1994).

A "minor participant" within the meaning of § 3B1.2(b) is a defendant "who is less culpable than most other participants, but whose role could not be described as minimal." U.S.S.G. § 3B1.2, cmt. n.5. The determination whether to apply this adjustment "is heavily dependent upon the facts of the particular case." *Id.* cmt. n.3(C).

**[9]** A. Walker claims that the district court erred in denying her the minor participant adjustment based on testimony that she had gone on several drug pick-ups despite its acknowledgment that she was not the principal person making these trips and the fact that she was in possession of lesser quantities of drugs and money at the time of arrest than her co-defendants. However, as we have already explained, "merely being less culpable than one's co-participants does not automatically result in minor [participant] status." *United States v. Andrus*, 925 F.2d 335, 338 (9th Cir. 1991). In denying A. Walker's request for a minor participant adjustment, the district court considered A. Walker's role in the conspiracy and found that:

> [T]he record as a whole . . . . clearly establishe[d] that [A. Walker] went to [pick up drugs] on several occasions, whether [she was] the principal person going or not is not the test. It is clear that [she was]

> making these trips voluntarily and that [she was] on those trips facilitating the return of very large quantities of methamphetamine to our state for distribution on one of our reservations or perhaps on more than one of our reservations.
>
> [A. Walker's] acting as a drug courier and a facilitator of this extensive operation, cannot, in the view of this court, be said to be either minor or minimal. [She is], in the view of this court, and [was] a significant participant in this ongoing illegal activity.

The district court also determined that A. Walker was responsible for between 1.5 and 5 kilograms of methamphetamine.

**[10]** The district court's findings are supported by the jury's verdict that A. Walker was responsible for a minimum of 500 grams of methamphetamine, and testimony from the trial and the sentencing hearing that A. Walker went on several drug pick-ups, each of which involved a minimum of a pound of methamphetamine. There was also testimony at trial that A. Walker regularly helped to repackage and sell large quantities of drugs. We hold that the district court's decision regarding A. Walker's minor participant status was not clearly erroneous. *See SEC v. Rubera*, 350 F.3d 1084, 1093-94 (9th Cir. 2003) ("So long as the district court's view of the evidence is plausible in light of the record viewed in its entirety, it cannot be clearly erroneous . . . .").

### 2

T. Walker asserts that the district court erred in attributing to her 500 grams or more of methamphetamine in computing her base offense level, arguing that there was no evidence that she was personally connected to or could reasonably have foreseen that this amount was involved in the conspiracy. We disagree.

**[11]** The crux of T. Walker's argument is that the district court should have disregarded the testimony Morales gave at her sentencing regarding her participation in the drug pick-ups because it was unreliable. *See Petty*, 982 F.2d at 1369. As explained above in Part II.B.1, however, Morales's testimony was sufficiently reliable for due process purposes because Morales had previously shown himself to be a credible witness. Additionally, even though there was no evidence directly corroborating Morales's testimony at sentencing about T. Walker's role in the drug pick-ups, there was other evidence establishing that she was significantly involved in the conspiracy: T. Walker was arrested with over forty-six grams of methamphetamine hidden on her person in pre-packaged amounts, and there was trial testimony that she had obtained sizeable amounts of methamphetamine and marijuana from D. Cantrell on at least two other occasions.[6] Based on the record as a whole, we hold that the district court did not clearly err in attributing T. Walker with 500 or more grams of methamphetamine.

### 3

Coversup first asserts that the district court erred in refusing to give him a reduction for his acceptance of responsibility. Section 3E1.1(a) of the Guidelines provides for a two-level downward adjustment where "the defendant clearly demonstrates acceptance of responsibility for his offense." While we review de novo the district court's interpretation of the Guidelines, *Kimbrew*, 406 F.3d at 1151, "[a] district court's decision about whether a defendant has accepted responsibility is a factual determination reviewed for clear error." *United States v. Velasco-Medina*, 305 F.3d 839, 853 (9th Cir. 2002) (internal quotation marks omitted). "[T]he determination of the sentencing judge is entitled to great deference on review" because "[t]he sentencing judge is in a

---

[6]Bernadine Bear testified that she saw T. Walker picking up a pound of marijuana and an ounce of methamphetamine on two different occasions.

unique position to evaluate a defendant's acceptance of responsibility." U.S.S.G. § 3E1.1, cmt. n.5.

The district court denied Coversup's request for the acceptance of responsibility adjustment on the grounds that: (1) Coversup had gone to trial, not just to preserve his constitutional suppression claim, but also to deny factual guilt; and (2) Coversup had not truthfully admitted the conduct comprising the offense of conviction. We hold that the first ground cited by the district court was erroneous, but affirm its denial of the adjustment on the second ground.

**[12]** Although Coversup's counsel acknowledged at the sentencing hearing that the acceptance of responsibility adjustment does not ordinarily apply to a defendant who chooses to go to trial, he argued that Coversup was nevertheless entitled to the reduction under the exception to this general rule, set forth in the second application note to § 3E1.1. This note describes the circumstances under which a defendant may be eligible for an acceptance of responsibility adjustment even though he or she goes to trial, stating in relevant part: "In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial. This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt . . . ." U.S.S.G. § 3E1.1, cmt. n.2.

The district court disagreed with counsel that the exception in the second application note applied, interpreting the exception to mean that the acceptance of responsibility adjustment is only "available [to a defendant who chooses to go to trial] in the rare case where the defendant has gone to trial to preserve a constitutional issue solely, not denying factual guilt." We confronted this same issue in *United States v. McKinney*, another case where "the district court appeared to assume, that a defendant who goes to trial can only receive the reduction if the trial is limited to issues unrelated to factual guilt." 15

F.3d 849, 853 (9th Cir. 1994). There we explained that the second application note "itself makes clear that the example [of a defendant going to trial to assert issue unrelated to factual guilt] was not intended to be exhaustive," and held that "in appropriate circumstances the reduction is also available in cases in which the defendant manifests genuine contrition for his acts but nonetheless contests his factual guilt at trial." *Id.* This rule, we explained, would best serve the "primary goal of the reduction [which] is to reward defendants who are genuinely contrite." *Id.* Here, as in *McKinney*, we conclude that the district court misconstrued § 3E1.1 when it concluded that the second application note exception did not apply because Coversup raised nonconstitutional issues at trial.

**[13]** However, Coversup does not qualify for the adjustment because he has not otherwise met his burden of showing that he accepted responsibility for his crime. *See United States v. Nielsen*, 371 F.3d 574, 582 (9th Cir. 2004). Under the third application note for § 3E1.1, entry of a guilty plea prior to trial, combined with truthful admission of the conduct comprising the offense of conviction and additional relevant conduct, constitutes "significant evidence" of contrition. U.S.S.G. § 3E1.1, cmt. n.3. "Thus, a defendant's choice to go to trial deprives the defendant of this 'significant evidence.' " *United States v. Ochoa-Gaytan*, 265 F.3d 837, 843 (9th Cir. 2001). However, in *Ochoa-Gaytan*, we held that "[e]ven without the 'significant evidence' of a guilty plea, a defendant who chooses to go to trial may still exhibit sufficient contrition to merit an adjustment under § 3E1.1." *Id.* We added that "[i]n this regard, it is important to note that the first application note to § 3E1.1 provides a non-exhaustive list of criteria — other than a guilty plea — which a sentencing court should consider in determining whether a defendant has manifested acceptance of responsibility." *Id.*

**[14]** Subsection (a) of the first application note for § 3E1.1 provides that it is "appropriate" for the district court to consider whether the defendant has "truthfully admitt[ed] the

conduct comprising the offense(s) of conviction, and truthfully admitt[ed] or not falsely den[ied] any additional relevant conduct for which the defendant is accountable under § 1B1.3 (Relevant Conduct)." U.S.S.G. § 3E1.1, cmt. n.1(a). The district court in this case found that Coversup had not met this criteria, and Coversup did not object to that finding or argue that there were other relevant factors weighing in favor of acceptance of responsibility either before the district court or in his briefing on appeal. Under these circumstances, the district court did not clearly err in concluding that Coversup had not accepted responsibility for his offenses, and its denial of the downward adjustment was proper.

Coversup's second assertion on appeal is that the district court erred in denying him a downward adjustment for his minimal participation in the conspiracy. A defendant is a "minimal participant" within the meaning of § 3B1.2(a) when he or she is "plainly among the least culpable of those involved in the conduct of a group." § 3B1.2, cmt. n.4. Coversup argues that the district court should have found that he was a minimal participant in the conspiracy because the jury convicted him only of possession with intent to distribute, while acquitting him of the conspiracy charge. This argument is unpersuasive.

In *United States v. Webster*, we held that a defendant seeking a § 3B1.2 downward adjustment where he or she was the sole participant in the offense of conviction must show that: (i) the defendant, although not charged or convicted, would otherwise be accountable for criminal conduct involving more than one participant; and (ii) the defendant's culpability for such conduct was relatively minor compared to that of the other participants. 996 F.2d 209, 212 (9th Cir. 1993) (per curiam); *see also United States v. Demers*, 13 F.3d 1381, 1385-86 (9th Cir. 1994) ("[B]y mandating a fact-based inquiry into the relative seriousness of the defendant's offense of conviction compared to his [or her] actual criminal conduct, the [Guidelines] commentary expressly allows for a

downward adjustment for a courier convicted of possession with intent to distribute, provided his [or her] role and culpability in the trafficking scheme are sufficiently minor compared to that of the other participants.").

[15] Coversup is ineligible for a minimal participant adjustment because he cannot satisfy the first prong of the *Webster* test. Although we have held that a defendant who is the "sole participant" in the offense of his or her conviction is not excluded from receiving a downward adjustment under § 3B1.2, such a defendant must produce evidence of his or her participation in a larger conspiracy to qualify for the reduction. *See Webster*, 996 F.2d at 212 (explaining that defendant "must, at a minimum" show that the relevant conduct for which he or she would "be otherwise accountable involved more than one participant"); *United States v. Walker*, 993 F.2d 196, 200 (9th Cir. 1993) (affirming denial of adjustment where defendant was "the only defendant involved in both counts of conviction" and "no evidence of a larger conspiracy was offered at trial or at sentencing"). Coversup repeatedly disclaimed any involvement in the conspiracy in his arguments to the district court and on appeal. During his sentencing proceedings, Coversup objected to the PSR's description of his offense because it included references to the conspiracy, and he urged the district court not to consider any evidence of the conspiracy in making its sentencing decisions. Additionally, in his briefing to this court, Coversup argued that he "clearly was not a participant in the overall, long standing [sic] conspiracy" but "was instead merely 'in the wrong place at the wrong time.' " Coversup cannot avail himself of a downward adjustment for minimal participation in the larger methamphetamine conspiracy involving his co-defendants while asserting at the same time that he never participated in said conspiracy. The district court did not clearly err in declining to grant Coversup a § 3B1.2(a) minimal participant adjustment.[7]

---

[7]Because Coversup did not present sufficient evidence linking himself to the larger conspiracy, it was unnecessary for the district court to reach

**4**

Like T. Walker, Renz contends that the district court clearly erred in calculating her base offense level using a drug quantity of 500 or more grams of methamphetamine. We reject this contention because the district court's finding that Renz could be held responsible for the multiple pounds of methamphetamine attributable to the conspiracy as a whole is plausible in light of the evidence in the record.

**[16]** Witnesses at trial attested to having seen Renz weighing and repackaging methamphetamine at D. Cantrell's residence on different occasions. The trial testimony and undisputed statements in the PSR also indicate that Renz distributed methamphetamine for D. Cantrell. This evidence of Renz's direct involvement in the packaging and distribution activities of the conspiracy leads us to the conclusion that the district court's finding that Renz was responsible for 500 or more grams of methamphetamine was not clearly erroneous.

**III**

**[17]** Because we cannot determine from our review of the record whether N. Cantrell was prejudiced by the asserted *Booker* error, we remand his case with instructions that the district court follow the procedures outlined in *Ameline*, 409 F.3d at 1084-85. As for T. Walker, A. Walker, Coversup, and Renz, we reject their claims of Guidelines application error for the reasons stated above, and affirm their sentences.

**AFFIRMED in part, REMANDED in part.**

the question of his relative culpability, and we will affirm its decision on the ground stated above. *See United States v. Cortez-Arias*, 403 F.3d 1111, 1114 n.7 (9th Cir.) *amended by* 425 F.3d 547 (9th Cir. 2005) ("Under our circuit's law we may . . . affirm on any ground supported by the record even if it differs from the rationale of the district court.") (internal quotation marks omitted).