# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CRAIG ANTHONY CARRINGTON,
        *Petitioner-Appellant,*

v.

UNITED STATES OF AMERICA,
        *Respondent-Appellee.*

No. 05-36143

D.C. No.
CV-05-05286-RJB

ROBERT CHARLES TILLITZ,
        *Petitioner-Appellant,*

v.

UNITED STATES OF AMERICA,
        *Respondent-Appellee.*

No. 05-36144

D.C. Nos.
CV-05-05144-RJB
CR-94-05074-RJB

OPINION

Appeal from the United States District Court
for the Western District of Washington
Robert J. Bryan, District Judge, Presiding

Argued and Submitted
August 18, 2006—Seattle, Washington

Filed December 13, 2006

Before: Harry Pregerson, John T. Noonan, and
Consuelo M. Callahan, Circuit Judges.

Opinion by Judge Harry Pregerson;
Partial Concurrence and Partial Dissent by Judge Callahan

19379

## COUNSEL

Russell V. Leonard, Assistant Federal Public Defender, Tacoma, Washington, for petitioner-appellant Robert Charles Tillitz.

Carol A. Elewski, Tumwater, Washington, for petitioner-appellant Craig Anthony Carrington.

Helen J. Brunner, Assistant United States Attorney, Seattle, Washington, for the respondent-appellee.

## OPINION

PREGERSON, Circuit Judge:

The two sentencing cases before us present unusual circumstances. In both, the district court expressed its dissatisfaction with the United States Sentencing Guidelines on the record during the sentencing hearing, at a time when the Guidelines' constitutionality was accepted. In addition, post-*Booker*, the district court implored us to recall our mandate in these two cases so that it could sentence Carrington and Tillitz to a just and proper sentence. We believe that these cases present extraordinary circumstances and accordingly, we recall our mandate and remand for re-sentencing.

## I.   Factual Background

### A.   *Craig Carrington's Original Sentencing Hearing*

On May 14, 1990, Craig Carrington pleaded guilty to conspiracy to distribute 500 grams or more of a mixture and sub-

stance containing cocaine under 21 U.S.C. §§ 841(a), 841(b)(1)(B). The district court, Judge Robert Bryan, held a two-day sentencing hearing on October 22-23, 1990. During that hearing, Judge Bryan commented:

> You know, let me just say something, I guess, for the record or the benefit of people that are interested.
>
> I hear the plea all the time from defense lawyers . . . that the guidelines are not fair as applied to an individual case and there ought to be a different result. . . . I'm stuck with bad law and criminal defendants are stuck with bad law and the rest of society is stuck with bad law. . . .
>
> I have been sentencing felons for 21 years, and in the last couple of years I'm faced with these guidelines, and it's very frustrating because it has diminished my responsibility and my authority. But the reason for these guidelines is to do exactly that. That is, to diminish the judge's discretion. I think that I must, if I am to do my job right, I've got to find the facts as I find them and apply the guidelines, being the law, to those facts . . . .

Judge Bryan sentenced Carrington to 324 months in prison, the low end of the applicable Guidelines range. Carrington's conviction and sentence were upheld on direct and collateral appeals.

B. *Robert Tillitz's Original Sentencing Hearing*

On April 27, 1998, Robert Tillitz was convicted by a jury for conspiracy to import hashish, conspiracy to distribute hashish, importation of hashish, possession of hashish with intent to distribute, and interstate and foreign travel in aid of racketeering enterprises. On August 14, 1998, Tillitz appeared, *in pro per*, before Judge Bryan for sentencing. Til-

litz argued, *inter alia*, that the Sentencing Guidelines were unconstitutional. In response, Judge Bryan commented:

> It might interest you to know, Mr. Tillitz, that I ruled in this court a long time ago that it was my opinion that these guidelines were contrary to the United States Constitution. That issue has been laid to rest contrary to my view by the United States Supreme Court. So these guidelines, in spite of your view on the legality of them and my view on it, they are part of the law of the land that bind me and I must follow that.

When Tillitz asked Judge Bryan for the name of the case in which he had discussed the constitutionality of the Guidelines, Judge Bryan answered: "It's past history now and it's of no assistance to us."

Judge Bryan then sentenced Tillitz to a 360-month term of imprisonment, the low end of the applicable Guidelines range. Tillitz's conviction and sentence were upheld on direct and collateral appeals.

### C. *Hearing on Writ of Audita Querela*

On March 2, 2005, Tillitz filed a writ of audita querela "for relief from an unconstitutional sentence" based on *United States v. Booker*, 543 U.S. 220 (2005). On April 15, 2005, Carrington filed a motion for modification of his sentence under 18 U.S.C. § 3582(c)(2). Judge Bryan appointed counsel for both Tillitz and Carrington.

On September 13, 2005, Judge Bryan noted substantial similarities between the cases of Carrington and Tillitz and entered a minute order joining the two cases. Carrington and Tillitz argued that the district court should grant a writ of *audita querela* because their sentences are unconstitutional.

Carrington also argued that his sentence should be modified under 18 U.S.C. § 3582(c)(2).

Judge Bryan denied relief on the grounds raised by the parties. *Sua sponte*, Judge Bryan asked this court to recall our mandate based on the existence of extraordinary circumstances, as we had done in *United States v. Crawford*, 422 F.3d 1145 (9th Cir. 2005), and to give him an opportunity to re-sentence these two defendants. *See Tillitz v. United States*, No. C05-5144RJB, 2005 WL 2921957, at *12-13 (W.D. Wash. Nov. 3, 2005). Judge Bryan then transferred these cases to this court for us to determine whether the petitioners were entitled to relief, including recall of the mandate. *See id.* at *13.

## II. Analysis

### A. *Grounds Raised by Petitioners*

[1] The district court properly concluded that the grounds for relief raised by Carrington and Tillitz in their initial motions are foreclosed by our case law. A writ of *audita querela*[1] is not an available remedy where the claims raised would be cognizable in a § 2255 habeas petition. *See United States v. Valdez-Pacheco*, 237 F.3d 1077, 1080 (9th Cir. 2001). Rather, common law writs such as *audita querela* and *coram nobis* survive "only to the extent that they fill 'gaps' in the current systems of postconviction relief." *Id.* at 1079.

[2] These petitioners argue that there *is* a gap in postconviction relief. They contend that the numerical limits on filing habeas petitions preclude them from raising a claim

---

[1]*Audita querela*, literally "the complaint having been heard," is a common law writ used to attack a judgment that was correct when rendered, but that later became incorrect because of circumstances that arose after the judgment was issued. *See Doe v. INS*, 120 F.3d 200, 203 n.4 (9th Cir. 1997).

based on *Booker* through a § 2255 habeas petition. *See* 28 U.S.C. §§ 2255, 2244(b)(3). We have previously held, however, that the statutory limits on second or successive habeas petitions do not create a "gap" in the post-conviction landscape that can be filled with the common law writs. *See Valdez-Pacheco*, 237 F.3d at 1080. Moreover, even if petitioners had been granted permission to file a second or successive habeas petition under 28 U.S.C. § 2244(b)(3), we have held that *Booker* does not apply to cases on collateral appeal. *See United States v. Cruz*, 423 F.3d 1119, 1121 (9th Cir. 2005) (per curiam). Therefore, petitioners are not entitled to relief on collateral review, however it is labeled.

**[3]** Similarly, the district court properly found that it could not modify petitioners' sentences under 18 U.S.C. § 3582(c)(2). Section 3582(c)(2) allows the district court to modify a sentence where the applicable sentencing range has been lowered by the Sentencing Commission subsequent to the imposition of the sentence. *Booker* did not lower sentencing ranges, nor was *Booker* an action "by the Sentencing Commission"; therefore § 3582(c)(2), by its own terms, does not apply here. *See United States v. Moreno*, 421 F.3d 1217, 1220-21 (11th Cir. 2005). To accept the Petitioners' construction of § 3582(c)(2) would be to stretch that provision beyond what its language can bear.

**[4]** Accordingly, the district court is correct that the only relief available to these petitioners would be for this court to recall our mandate. We now turn to that question.

B.  *Recall of the Mandate*

**[5]** A mandate should be recalled only "in extraordinary circumstances." *Calderon v. Thompson*, 523 U.S. 538, 550 (1998). Our authority to recall the mandate should be exercised only "for good cause or to prevent injustice." *Zipfel v. Halliburton Co.*, 861 F.2d 565, 567 (9th Cir. 1988) (internal citations and quotation marks omitted).

**[6]** We have held that the Supreme Court's decision in *Booker* was not, by itself, sufficient to justify recall of the mandate in cases finalized before *Booker* was filed. *See United States v. King*, 419 F.3d 1035, 1036 (9th Cir. 2005). But *Booker* was an extraordinarily important decision that may, when combined with other extraordinary circumstances, justify recall of the mandate. In *United States v. Crawford*, 422 F.3d 1145 (9th Cir. 2005), we recalled the mandate in a pre-*Booker* sentence to allow the district court to re-sentence under *Booker*. We based our decision on the existence of two extraordinary circumstances: (a) that the sentencing judge had expressed reservations at the time of sentencing about the sentence required under the mandatory Guidelines; and (b) that the Supreme Court's decision in *Blakely*, which "foreshadowed" its holding in *Booker*, was rendered before our mandate issued in *Crawford*. *See id.* at 1145-46.

**[7]** Here, the first basis for our decision in *Crawford* is present. In both Carrington and Tillitz's original sentencing hearing, Judge Bryan expressed his frustration with the lack of discretion afforded to district court judges by the Guidelines. The second basis is not present, purely by the "accident of timing" as Judge Bryan noted. In *Crawford*, however, we emphasized that this combination of circumstances was not the only one that would justify recalling our mandate. *See id.* at 1146 n.2. Instead, we noted that "future panels will necessarily evaluate the existence of 'extraordinary circumstances' warranting the recall of a mandate based on the facts of their individual cases." *Id.*

**[8]** Here, there is an additional circumstance not present in *Crawford* that compels our attention—Judge Bryan's impassioned plea to this court.

In his November 3, 2005 order, Judge Bryan said:

A Sentencing Guidelines scheme was adopted by Congress and implemented by the United States Sen-

tencing Commission on November 1, 1987. Many judges, including the undersigned, believed that the Sentencing Guidelines were contrary to the requirements of the U.S. Constitution. Nevertheless, the Supreme Court, in its wisdom, found that the guidelines passed constitutional muster.

Many defendants, including Mr. Tillitz and Mr. Carrington, were sentenced under the mandatory guidelines scheme, and many, including Mr. Tillitz and Mr. Carrington, are still incarcerated under mandatory guideline sentences. . . .

During the period of the guidelines' mandatory life—1987 to 2005—judges, like the undersigned, did their best to apply the law, assuming the constitutionality of the guidelines, and often sentencing defendants to sentences that were inappropriate under any law or theory of sentencing except the guidelines. District judges, in other words, tried to follow the law, even if it appeared to lead to injustice.

Now, under *Booker*, it is clear that the guidelines sentencing scheme was unconstitutional all along. It follows that defendants, still incarcerated under an unconstitutional sentencing scheme, would seek resentencing, even knowing that, on resentencing, longer sentences might be imposed. Yet, because of retroactivity rules, defendants serving unconstitutional sentences are offered no relief, no remedy, and no justice.

Trial judges, more than anything, want to do the right thing. We understand our obligation to follow the law, but deeply—and even desperately—hope that the law will lead to justice. If we are part of an

injustice, we want to set it right, even if it involves a great deal of extra work. To quote Gerry Spence:

> [S]ometimes a judge doesn't know how to get justice. . . . [T]he judge has to just sit up there and watch justice fail right in front of him, right in his own courtroom, and he doesn't know what to do about it, and it makes him feel sad. . . . Sometimes he even gets angry about it.

Gerry H. Spence, *Of Murder and Madness: A True Story*, 490 (1983).

> This judge, sad and a little angry, would welcome an opportunity to resentence these defendants to a constitutional and legal sentence.

*Tillitz*, 2005 WL 2921957, at *12-13 (internal citations omitted).

[9] We believe these two circumstances, particularly in tandem, are quite extraordinary. First, that Judge Bryan would make a statement about the constitutionality of the Guidelines at the sentencing hearing, at a time that the Guidelines were firmly entrenched, is unusual. In Carrington's sentencing hearing particularly, Judge Bryan presaged the fault the Supreme Court found in the Guidelines in *Booker*: that the Guidelines unconstitutionally "diminish[ed] the judge's discretion" to sentence defendants to an appropriate sentence, and required him to "find the facts . . . and apply the [G]uidelines, being the law, to those facts."

[10] Second, Judge Bryan implores this court to recall our mandate. *Booker* restored the role of the district court as the person uniquely suited to consider all the circumstances surrounding a criminal defendant and to fashion a sentence most just and appropriate for that individual. For the same reason,

we put great stock in the fact that Judge Bryan tells us that Carrington and Tillitz are *particularly* worthy of re-sentencing. These two cases have weighed on Judge Bryan's conscience eight years and sixteen years, respectively, after the original sentences were imposed. They compelled him to the point that he would *sua sponte* request that this court recall its mandates and that he would voluntarily assume the additional responsibility involved in re-sentencing these defendants. We believe that the number of cases in which a district court will feel so strongly about the need to re-sentence is small, making these cases truly extraordinary.

**[11]** Our interest in the finality of judgment is not so strong that we would not allow a district court judge the opportunity to remedy what the judge considers to be an "injustice" and to re-sentence a defendant to a sentence that is just and proper. *See Gondeck v. Pan Am. World Airways, Inc.*, 382 U.S. 25, 26-27 (1965). In the two cases before us, we conclude that extraordinary circumstances exist to warrant recall of the mandates.

## MANDATES RECALLED, SENTENCES VACATED, AND CASES REMANDED.

CALLAHAN, Circuit Judge concurring and dissenting:

The majority, after affirming the denial of appellants' creative requests for relief by way of a writ of *audita querela* and pursuant to 18 U.S.C. § 3582(c)(2) (modification of sentence),[1] misuses our equitable powers to recall the mandates in cases that became final over fifteen years ago and six years ago,

---

[1] I concur in the majority's conclusions that defendants "are not entitled to relief on collateral review, however it is labeled," (maj. op. 19386) and that their sentences are not subject to modification under 18 U.S.C. § 3582(c)(2).

respectively. I dissent because the majority misreads the factual record, departs from controlling precedent and the positions taken by our sister circuits, and proposes a premise on which any defendant sentenced under the *pre-Booker* guidelines may seek to be re-sentenced.

I

Initially, it should be observed that there is nothing in the record of either of these cases to suggest any individual equities. As noted by the majority, at the initial sentencing hearings, Judge Bryan expressed his frustration with the lack of discretion afforded to district judges by the mandatory sentencing guidelines. (maj. op. 19387) But there is nothing to suggest that these appellants were different from any other persons sentenced under the guidelines. In fact, at oral argument, government counsel noted that when one of the appellants initially sought a downward departure, the district court denied the request. Indeed, the majority's lengthy quote of Judge Bryan's comments when he denied appellants relief in 2005 makes clear that Judge Bryan's objections were to mandatory guidelines as such and does not suggest that appellants were in any way exceptional.[2] The critical point is not that mandatory guidelines did not produce overly long sentences, but that there is nothing in the record to distinguish appellants from all the other defendants sentenced under the mandatory sentencing guidelines by Judge Bryan.

II

There is no doubt that the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), "marked a major transformation in the law of federal criminal sentencing." *United States v. Mohamed*, 459 F.3d 979, 984 (9th Cir.

---

[2]Just before the section cited to by the majority, Judge Bryan stated that the "sentences may have been appropriate at the time they were imposed, or they may not have been."

2006). Furthermore, we have held that *Booker* does not operate retroactively, and "does not apply to cases on collateral review where the conviction was final as of the date of *Booker's* publication." *United States v. Cruz*, 423 F.3d 1119, 1121 (9th Cir. 2005). Both convictions at issue here were final years before the Supreme Court decided *Booker*. Thus, we should affirm the district court's denial of relief because appellants are not entitled to relief under a writ of *audita querela*, not entitled to relief under 18 U.S.C. § 3582(c)(2), and not entitled to any relief under *Booker*.

### III

Although the majority basically determines that appellants are not entitled to relief on the grounds they raised, it attempts to avoid the consequences of its determination by finding that these appeals present "extraordinary circumstances" which justify a recall of the mandates. The majority recognizes that it needs to circumvent this court's opinion which holds that *Booker* by itself does not justify a recall of the mandate. *See United States v. King*, 419 F.3d 1035, 1036 (9th Cir. 2005). In attempting to allow appellants to be resentenced, the majority improperly expands the definition of "extraordinary circumstances" to a point at which it could be invoked by almost every person sentenced under the mandatory sentencing guidelines. This is contrary to the Supreme Court reiteration that recalls of mandate are limited to truly exceptional circumstances, *Calderon v. Thompson*, 523 U.S. 538, 549-50 (1998), and contradicts our holdings in *Cruz* and *King* that *Booker* is not retroactive.

### A.

In *Calderon*, the Supreme Court held that we committed a grave abuse of discretion in recalling our mandate. *Calderon*, 523 U.S. at 542. Although the Supreme Court's concerns were partially based on the fact that the case was a state capital case, *see id*. at 553-59, it first set forth the standard for an

appellate court recalling its mandate. The Court accepted that we have an inherent power to recall our mandate, but noted:

> In light of "the profound interests in repose" attaching to the mandate of a court of appeals, however, the power can be exercised only in extraordinary circumstances. 16 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 3938, p. 712 (2d ed.1996). The sparing use of the power demonstrates it is one of last resort, to be held in reserve against grave, unforeseen contingencies.

*Id.* at 550.[3]

## B.

What then are the "extraordinary circumstances" that justify recalling the mandates in this case? They cannot arise out

---

[3]In his dissent, Justice Souter agreed with the majority's description of the restricted availability of recalling a mandate. He commented:

> To be sure, there lurks in the background the faint specters of overuse and misuse of the recall power. All would agree that the power to recall a mandate must be reserved for "exceptional circumstances," 120 F.3d, at 1048; 16 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 3938, pp. 716-717, n. 14 (1996) (citing cases from the various Courts of Appeals recognizing that the power must be used sparingly), in the interests of stable adjudication and judicial administrative efficiency, on which growing caseloads place a growing premium. All would agree, too, that the *sua sponte* recall of mandates could not be condoned as a mechanism to frustrate the limitations on second and successive habeas petitions, see, *e.g.*, 28 U.S.C. § 2244(b). If there were reason to suppose that the *sua sponte* recall would be overused or abused in either respect, we might well see its use as unreasonable in a given case simply to deter resort to it in too many cases.

*Calderon*, 523 U.S. at 569-70 (footnote omitted). The majority's recall appears to be the type of "mechanism [used] to frustrate the limitations on second and successive habeas petitions" disapproved by Justice Souter.

of the Supreme Court's decision in *Booker*, because we have held that *Booker* does not create the "extraordinary circumstances" necessary to justify recalling a mandate. *King*, 419 F.3d at 1036.

The majority, however, cites *United States v. Crawford*, 422 F.3d 1145 (9th Cir. 2005), as holding that *Booker* "when combined with other extraordinary circumstances, justif[ies] recall of the mandate." (maj. op. 19387) My quarrel is not with this reading of *Crawford*. Rather, I object to the majority's expansion of the unique "extraordinary circumstances" present in *Crawford* into a justification that can be invoked by any person who was sentenced under the mandatory sentencing guidelines.

In *Crawford*, we found "extraordinary circumstances" to recall the mandate because (1) "the sentencing judge had expressed explicit reservations on the record about the sentence required under the previously mandatory Sentencing Guidelines," and (2) "the Supreme Court's decision in *Blakely v. Washington*, [542 U.S. 296 (2004)] . . . foreshadowing its holding in . . . *Booker* . . . was rendered before the mandate issued." *Crawford*, 422 F.3d at 1145-46. The court further stated:

> [i]n stressing that our decision here rests on both the sentencing judge's expressed misgivings about the sentence required by the mandatory Guidelines as well as the relative timing of the Supreme Court's *Blakely* decision and the termination of our appellate jurisdiction, we do not suggest that these same elements must always be present in order for a mandate to be recalled.

*Id*. at 1146 n.2.

In addition, it is critical to recognize that in *Crawford*, the panel that had just decided Crawford's direct appeal, recalled

its own mandate. In fact, the motion to recall the mandate was made less than a month after the panel issued its memorandum disposition[4] and within weeks of the issuance of the court's mandate. Thus, although the mandate had issued, Crawford's direct challenge to his conviction and sentence had not been finally decided because the time for filing a petition for a writ of certiorari had not expired.[5] *See* SUP. CT. R. 13 (allowing 90 days from a circuit court's decision for the filing of a petition for certiorari). In contrast here, appellants' convictions and sentences were affirmed years ago by different panels. Moreover, the proposal that we recall our mandates is not raised in the appellants' direct appeals, but in appeals from the district court's denial of their successive collateral attacks on their sentences.

Our precedents, including *Crawford*, do not permit the recall of the mandates in the cases at bar because (1) although the district judge expressed his displeasure with mandatory sentencing guidelines, as previously noted, *there are no other exceptional circumstances*, and (2) the appellants had no direct appeal or collateral proceedings pending when *Booker* was decided.

The majority, however, excuses the lack of any extraordinary circumstances by commenting that the fact that appellants did not have any proceedings pending when *Booker* was decided was an "accident of timing." (maj. op. 19387) This will not do. First, appellants' direct appeals were exhausted years ago and their 2005 filings that led to these appeals came

---

[4]*United States v. Crawford*, 102 Fed. Appx. 91 (9th Cir. 2004).

[5]The particular facts in *Crawford* suggest that it may be viewed as only a minimal extension of our policy allowing for limited remands on direct appeals to consider *Booker* claims. *See United States v. Ameline*, 409 F.3d 1073, 1074 (9th Cir. 2005), and *United States v. Cantrell*, 433 F.3d 1269, 1278 (9th Cir. 2006). Moreover, as the time for filing a petition for certiorari had not run, *Crawford* can be reconciled with our holding in *Cruz* that *Booker* "does not apply retroactively to convictions that became final prior to its publication." *Cruz*, 423 F.3d at 1119.

after they had unsuccessfully pursued a number of collateral challenges to their convictions and sentences.[6] Second, as noted by the district court, the appellants' predicament was not just an "accident of timing" because the appellants could have argued, as did Booker, that the mandatory guidelines were unconstitutional.[7] Third, and related to the first two points, the majority's dismissal of timing eviscerates the distinctions courts have always made between direct appeals, collateral challenges, and successive collateral challenges.[8] It is not just an "accident of timing" that a defendant does not raise an issue on appeal or that a favorable change in the law comes only years after a defendant's conviction becomes final.

The unreasonableness of the majority's approach is also evident in its failure to identify what mandates it is recalling. The majority is not recalling the mandate in these appeals

---

[6]The district court noted that after we denied Carrington relief on his direct appeal he filed a motion pursuant to 28 U.S.C. § 2255 in 1996, a second motion pursuant to § 2255 in 1999, and a petition for a writ of *coram nobis* in 2004, all of which were denied. The district court noted that following his unsuccessful appeal, Tillitz filed a motion pursuant to § 2255 in 2001, a petition for a writ of mandamus in 2003, and another motion pursuant to § 2255 in 2004, all of which were denied.

[7]In its November 5, 2005, order the district court noted:

> Although *Booker* was decided after Mr. Tillitz and Mr. Carrington's convictions became final, either of these petitioners could have raised, at sentencing and on direct appeal, the issues that underlie *Booker*: the sentence enhancements determined by a judge rather than by a jury beyond a reasonable doubt; and the mandatory application of the Sentencing Guidelines. Mr. Tillitz and Mr. Carrington did not specifically raise these issues at sentencing and on direct appeal.

[8]For example, if the existence or non-existence of pending challenges could be dismissed as an "accident of timing," the court would not have to wrestle with issues such as whether a Sixth Amendment challenge based on a judge-made finding of a prior conviction had been preserved. *See United States v. Beng-Salazar*, 452 F.3d 1088, 1092-95 (9th Cir. 2006).

because no mandate has issued. Furthermore, as the majority agrees that the district court properly denied appellants any relief on their 2005 filings, staying the mandate in these appeals would not provide the appellants any relief. Mr. Tillitz was last before this court in February 2005, when we denied him authorization to file a successive § 2255 motion. Mr. Carrington was last before this court in December 2004, when we denied him a certificate of appealability. It appears that sometime after August 1996, this court affirmed the district court's denial of Mr. Carrington's first motion for relief under 28 U.S.C. § 2255, and that in February 2003, this court dismissed Mr. Tillitz's appeal from the district court's denial of his first § 2255 motion. It is doubtful that recalling the mandates in any of these matters would provide appellants any relief. Thus, the majority probably intends to recall the mandates in Mr. Carrington's direct appeal which most likely issued in 1991 or 1992, and in Mr. Tillitz's direct appeal that issued in 2001. And the majority's reason for such truly extraordinary relief? Simply that the Supreme Court decided *Booker* in 2005, because, according to the majority, defendants' failure to have any pending proceedings at that time was just an "accident of timing." I believe that our decisions in *Cruz*, 423 F.3d at 1121, and *King*, 419 F.3d at 1036, preclude a three-judge panel of this court from adopting the majority's logic.

## C.

Moreover, I agree with the Sixth Circuit's persuasive explanation in *United States v. Saikaly*, 424 F.3d 514 (6th Cir. 2005), that *Booker* does not support the recall of mandates. That court reasoned:

> Although this court has granted motions to recall the mandate in cases which were not yet final at the time the motion was filed, other courts of appeals which have addressed similar motions based upon *Booker* (or the earlier decisions in *Apprendi* and *Blakely*)

have found no extraordinary circumstances warranting the recall of a mandate issued in a prior (and final) direct appeal. These decisions hold that the proper remedy to attack a sentence in a final criminal proceeding lies under § 2255, and the fact that such remedy is no longer available does not warrant a recall of the mandate. *See, e.g., United States v. Fraser,* 407 F.3d 9, 10-11 (1st Cir. 2005) (per curiam denial of petition for rehearing) ("If mandate could be recalled merely based on *Booker,* that result would provide an avenue to escape the restrictions Congress has imposed on habeas review."); *United States v. Ford,* 383 F.3d 567, 568 (7th Cir. 2004) (per curiam), *cert. denied,* ___ U.S. ___, 125 S.Ct. 927, 160 L.Ed.2d 813 (2005) (motion, based upon the decision in *Blakely,* to recall mandate issued three years earlier cannot be used to avoid the successive petition restrictions of § 2255); *Bottone v. United States,* 350 F.3d 59, 64 (2d Cir. 2003), *cert. denied,* ___ U.S. ___, 125 S.Ct. 98, 160 L.Ed.2d 130 (2004) ("[R]ecalling the mandate more than six years after its issuance 'just to apply the benefit of hindsight,' would constitute an abuse of discretion." (*quoting Gray-Bey v. United States,* 209 F.3d 986, 988 (7th Cir. 2000) (per curiam))); *United States v. Falls,* 129 Fed.Appx. 420, 420-21 (10th Cir. 2005) (unpublished order) ("The proper means for challenging confinement pursuant to an allegedly unconstitutional sentence is not a motion to recall the mandate, but a habeas corpus proceeding under 28 U.S.C. § 2255.").

These decisions deny any avenue of relief under *Booker* to defendants whose direct appeals were final at the time that decision was rendered. Although the defendant may argue that there is an element of unfairness in this result, it is the same element found in any Supreme Court decision which

announces a new rule applicable to criminal defen-
dants with pending prosecutions or appeals, but
which is not made retroactive to defendants whose
cases are final. *Compare Allen v. Hardy,* 478 U.S.
255, 106 S.Ct. 2878, 92 L.Ed.2d 199 (1986) (per
curiam) (holding the decision in *Batson v. Kentucky,*
476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986)
not to be applied retroactively to cases on collateral
review) *with Griffith v. Kentucky,* 479 U.S. 314, 107
S.Ct. 708, 93 L.Ed.2d 649 (1987) (holding *Batson* to
be applied retroactively to cases on direct appeal or
not yet final when the *Batson* case was decided).

*Id.* at 517-18 (footnotes omitted).

It follows that the majority's purported finding of "extraor-
dinary circumstances" should be seen for what it is, an effort
to repudiate or circumvent our holdings that *Booker* is not
retroactive. *Cruz,* 423 F.3d at 1121; *King,* 419 F.3d at 1036.
Indeed, the only additional factor mentioned by the majority
is that the district judge was outspokenly critical of mandatory
sentencing guidelines. But the retroactive application of
*Booker* cannot turn on the degree to which the sentencing
judge grimaced when sentencing under the mandatory sen-
tencing guidelines.[9] Either *Booker* is retroactive or it is not.
This is a matter of law. It would be unfair to countless defen-
dants and to numerous trial judges to have a defendant's right
to possible relief from a new Supreme Court decision turn on
the extent to which the trial judge grumbled while enforcing
the law.

Accordingly, stripped of its facade of a finding of "extraor-
dinary circumstances" the majority's recall of the mandates in

---

[9]Would there be sufficient "extraordinary circumstances" under the
majority's approach if the trial judge failed to voice his or her objections
at the particular defendant's sentencing, but objected to mandatory sen-
tencing guidelines when sentencing other defendants?

effect applies *Booker* retroactively to grant relief to defen-
dants whose convictions were final years before *Booker* was
decided. I dissent because the majority's approach cannot be
squared with our opinions in *Cruz* and *King*, is inconsistent
with the position taken by our sister circuits, and abuses our
inherent authority to recall the mandate as a last resort to cor-
rect "grave, unforeseen contingencies." *Calderon*, 523 U.S. at
550.