# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CRAIG ANTHONY CARRINGTON,
              *Petitioner-Appellant,*

v.

UNITED STATES OF AMERICA,
              *Respondent-Appellee.*

No. 05-36143

D.C. Nos.
CV-05-05286-RJB
CR-89-00088-RJB

ROBERT CHARLES TILLITZ,
              *Petitioner-Appellant,*

v.

UNITED STATES OF AMERICA,
              *Respondent-Appellee.*

No. 05-36144

D.C. Nos.
CV-05-05144-RJB
CR-94-05074-RJB

ORDER AND
SUPERSEDING
OPINION

Appeal from the United States District Court
for the Western District of Washington
Robert J. Bryan, District Judge, Presiding

Argued and Submitted
August 14, 2006—Seattle, Washington

Filed September 11, 2007

Before: Harry Pregerson, John T. Noonan, and
Consuelo M. Callahan, Circuit Judges.

Opinion by Judge Callahan;
Concurrence by Judge Noonan;
Partial Concurrence and Partial Dissent by Judge Pregerson

12123

**COUNSEL**

Russell V. Leonard, Assistant Federal Public Defender, Tacoma, Washington, for petitioner-appellant Robert Charles Tillitz.

Carol A. Elewski, Tumwater, Washington, for petitioner-appellant Craig Anthony Carrington.

Helen J. Brunner, Assistant United States Attorney, Seattle, Washington, for the respondent-appellee.

## ORDER

The opinion filed on December 13, 2006, is hereby withdrawn. A Superseding Opinion is filed simultaneously with this order.

---

## OPINION

CALLAHAN, Circuit Judge:

In these sentencing cases Robert Tillitz and Craig Carrington (petitioners) assert a number of creative arguments in an attempt to have their final sentences reconsidered in light of the Supreme Court's opinion in *United States v. Booker*, 543 U.S. 220 (2005). We conclude that petitioners have not presented exceptional circumstances sufficient to support a grant of extraordinary relief such as the recall of our prior mandates.

## I.

On May 14, 1990, Craig Carrington pleaded guilty to conspiracy to distribute 500 grams or more of a mixture and substance containing cocaine under 21 U.S.C. §§ 841(a), 841(b)(1)(B). The district court, Judge Robert Bryan, held a two-day sentencing hearing on October 22-23, 1990. During that hearing, Judge Bryan expressed his frustration with mandatory sentencing guidelines and sentenced Carrington to 324 months in prison, the low end of the applicable range under the United States Sentencing Guidelines. Carrington's conviction and sentence were upheld on direct and collateral appeals.

On April 27, 1998, Robert Tillitz was convicted by a jury for conspiracy to import hashish, conspiracy to distribute hashish, importation of hashish, possession of hashish with

intent to distribute, and interstate and foreign travel in aid of racketeering enterprises. On August 14, 1998, Tillitz appeared *pro se* before Judge Bryan for sentencing. Tillitz argued, *inter alia*, that the Sentencing Guidelines were unconstitutional. In response, Judge Bryan indicated that while he might agree, the issue had been laid to rest by the United States Supreme Court. Judge Bryan then sentenced Tillitz to a 360-month term of imprisonment, the low end of the applicable Guidelines range. Tillitz's conviction and sentence were upheld on direct and collateral reviews.

On March 2, 2005, Tillitz filed a writ of *audita querela* "for relief from an unconstitutional sentence" based on *Booker*. A month later, Carrington filed a motion for modification of his sentence under 18 U.S.C. § 3582(c)(2). Judge Bryan appointed counsel for both Tillitz and Carrington. In September 2005, Judge Bryan consolidated the cases because of their substantial similarities. Thereafter, both argued that their sentences were unconstitutional and also should be modified under 18 U.S.C. § 3582(c)(2).

On November 3, 2005, Judge Bryan denied relief on the grounds raised by the parties. He noted, however, that in *United States v. Crawford*, 422 F.3d 1145 (9th Cir. 2005), the Ninth Circuit had recalled its mandate in a sentencing case that involved "extraordinary circumstances." Judge Bryan observed that although neither petitioner had filed a motion to recall the mandate, this distinction "may be more form rather than substance" and the availability of such relief was "for the Ninth Circuit to decide." These appeals followed.[1]

---

[1]Although the district court purported to transfer petitioners' motions to the Ninth Circuit, its order did not indicate the statutory basis for such a transfer. However, both petitioners then filed timely notices of appeal and on December 2, 2005, the district court granted petitioners Certificates of Appealability as provided for by 28 U.S.C. § 2253(c).

## II.

**[1]** The district court properly concluded that the grounds for relief raised by petitioners in their initial motions are foreclosed by our case law. A writ of *audita querela*[2] is not an available remedy where the claims raised would be cognizable in a § 2255 habeas petition. *See United States v. Valdez-Pacheco*, 237 F.3d 1077, 1080 (9th Cir. 2001). Rather, common law writs such as *audita querela* and *coram nobis* survive "only to the extent that they fill 'gaps' in the current systems of postconviction relief." *Id.* at 1079.

**[2]** Petitioners argue that there *is* a gap in post-conviction relief. They contend that the numerical limits on filing habeas petitions preclude them from raising a claim based on *Booker* through a § 2255 habeas petition. *See* 28 U.S.C. §§ 2255, 2244(b)(3). We have previously held, however, that the statutory limits on second or successive habeas petitions do not create a "gap" in the post-conviction landscape that can be filled with the common law writs. *See Valdez-Pacheco*, 237 F.3d at 1080. Moreover, even if petitioners had been granted permission to file second or successive habeas petitions under 28 U.S.C. § 2244(b)(3), we have held that *Booker* does not apply to cases on collateral review. *See United States v. Cruz*, 423 F.3d 1119, 1121 (9th Cir. 2005) (per curiam). Therefore, petitioners are not entitled to relief on collateral review, however it is labeled.

**[3]** Similarly, the district court properly found that it could not modify petitioners' sentences under 18 U.S.C. § 3582(c)(2). Section 3582(c)(2) allows the district court to modify a sentence where the applicable sentencing range has

---

[2]*Audita querela*, literally "the complaint having been heard," is a common law writ used to attack a judgment that was correct when rendered, but that later became incorrect because of circumstances that arose after the judgment was issued. *See Doe v. INS*, 120 F.3d 200, 203 n.4 (9th Cir. 1997).

been lowered by the Sentencing Commission subsequent to the imposition of the sentence. *Booker* did not lower sentencing ranges, nor was *Booker* an action "by the Sentencing Commission"; therefore § 3582(c)(2), by its own terms, does not apply here. *See United States v. Moreno*, 421 F.3d 1217, 1220-21 (11th Cir. 2005). To accept petitioners' construction of § 3582(c)(2) would be to stretch that provision beyond what its language can bear. Accordingly, the district court correctly denied petitioners relief.

## III.

The district court speculated that this court might be able to grant petitioners relief by recalling its mandates, and petitioners press that argument on appeal. We conclude, however, that to the extent that such relief is not barred by our opinions in *Cruz*, 423 F.3d at 1121, and *United States v. King*, 419 F.3d 1036 (9th Cir. 2005), petitioners have not presented the exceptional circumstances and equities necessary for a grant of extraordinary relief.

[4] We have the inherent power to recall our mandate in order to protect the integrity of our processes, but should only do so in exceptional circumstances. *Zipfel v. Halliburton, Co.*, 861 F.2d 565, 567 (9th Cir. 1988). In *Calderon v. Thompson*, 523 U.S. 538, 549-50 (1998), the Supreme Court affirmed our inherent power to recall our mandate. The Court, however, held that recalling the mandate in that case was "a grave abuse of discretion." *Id*. at 541. The Court noted:

> In light of "the profound interests in repose" attaching to the mandate of a court of appeals, however, the power can be exercised only in extraordinary circumstances. 16 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 3938, p. 712 (2d ed. 1996). The sparing use of the power demonstrates it is one of last resort, to be held in reserve against grave, unforeseen contingencies.

*Id*. at 550.[3] The question then becomes whether petitioners have presented "grave, unforeseen contingencies" that will support the extraordinary relief of a recall of mandate.

[5] The essence of petitioners' claim is that they are entitled to relief in light of the Supreme Court's decision in *Booker*. We, however, have held that *Booker* is not retroactive and is not by itself sufficient to justify a recall of the mandate in cases finalized before *Booker* was decided. *King*, 419 F.3d 1036.

[6] An argument, however, has been made that this case presents the type of extraordinary circumstances that led us to recall our mandate in *United States v. Crawford*, 422 F.3d 1145 (9th Cir. 2005). There we found "extraordinary circumstances" to recall the mandate because (1) "the sentencing judge had expressed explicit reservations on the record about the sentence required under the previously mandatory Sentencing Guidelines," and (2) "the Supreme Court's decision in *Blakely v. Washington*, [542 U.S. 296 (2004)] . . . foreshad-

---

[3]In his dissent, Justice Souter agreed with the majority's description of the restricted availability of recalling a mandate. He commented:

> To be sure, there lurks in the background the faint specters of overuse and misuse of the recall power. All would agree that the power to recall a mandate must be reserved for "exceptional circumstances," 120 F.3d, at 1048; 16 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 3938, pp. 716-717, n. 14 (1996) (citing cases from the various Courts of Appeals recognizing that the power must be used sparingly), in the interests of stable adjudication and judicial administrative efficiency, on which growing caseloads place a growing premium. All would agree, too, that the *sua sponte* recall of mandates could not be condoned as a mechanism to frustrate the limitations on second and successive habeas petitions, see, *e.g.*, 28 U.S.C. § 2244(b). If there were reason to suppose that the *sua sponte* recall would be overused or abused in either respect, we might well see its use as unreasonable in a given case simply to deter resort to it in too many cases.

*Calderon*, 523 U.S. at 569-70 (footnote omitted).

owing its holding in . . . *Booker* . . . was rendered before the mandate issued." *Crawford*, 422 F.3d 1145-46.[4]

Neither of the two factors that supported relief in *Crawford* are present here. First, although Judge Bryan readily expressed his disapproval of mandatory sentences, his statements do not suggest that there are any exceptional circumstances that distinguish either petitioner from other persons sentenced under the Guidelines prior to *Booker*. Indeed, in his November 2005 order Judge Bryan observed neutrally that the "sentences may have been appropriate at the time they were imposed, or they may not have been."

Second, *Crawford* presented a unique question of timing that favored equitable relief. The panel had just decided Crawford's direct appeal, when it recalled its own mandate. In fact, the motion to recall the mandate was made less than a month after the panel issued its memorandum disposition[5] and within weeks of the issuance of the court's mandate. Thus, although the mandate had issued, Crawford's direct challenge to his conviction and sentence had not become "final" because the time for filing a petition for a writ of certiorari had not expired.[6] *See* SUP. CT. R. 13 (allowing 90 days

---

[4]*Crawford* further stated:

> [i]n stressing that our decision here rests on both the sentencing judge's expressed misgivings about the sentence required by the mandatory Guidelines as well as the relative timing of the Supreme Court's *Blakely* decision and the termination of our appellate jurisdiction, we do not suggest that these same elements must always be present in order for a mandate to be recalled.

*Id.* at 1146 n.2. We are not called upon to consider the limits of this statement because appellants have only argued the district court's alleged misgivings and that timing is irrelevant. They do not assert any element not present in *Crawford*.

[5]*United States v. Crawford*, 102 Fed. Appx. 91 (9th Cir. 2004).

[6]Federal Rule of Appellate Procedure 40 provides that unless time is shortened or extended, a petition for rehearing should be filed within four-

from a circuit court's decision for the filing of a petition for certiorari).

**[7]** The particular timing in *Crawford* indicates that it was, at most, a minimal extension of our policy allowing for limited remands on direct appeals to consider *Booker* claims. *See United States v. Ameline*, 409 F.3d 1073, 1074 (9th Cir. 2005), and *United States v. Cantrell*, 433 F.3d 1269, 1278 (9th Cir. 2006). Moreover, as the time for filing a petition for certiorari had not run, *Crawford* did not conflict with our holding in *Cruz* that *Booker* "does not apply retroactively to convictions that became final prior to its publication." *Cruz*, 423 F.3d 1119.

**[8]** In contrast, here, petitioners do not seek the recall of the mandate of a case that is still subject to the filing of a petition for a writ of certiorari to the Supreme Court. Instead, in order for the recalls of mandate to provide the district court with authority to modify petitioners' sentences, we would have to recall the mandates that issued in petitioners' direct appeals from their convictions and sentences.[7] However, we affirmed Carrington's conviction and sentence on direct appeal in 1996, and Tillitz's conviction and sentence were affirmed before 2001.

**[9]** The recognition that petitioners seek the recall of the

teen days of the entry of judgment. Federal Rule of Appellate Procedure 41 states that the mandate should issue seven calendar days after the time for filing a petition for rehearing expires. Although Rule 41 allows a party to seek a stay of the mandate pending the filing of a petition for a writ of certiorari, there is no indication that a party is required to seek a stay pending certiorari.

[7]The recall of our mandates in any of petitioners' appeals from the denials of their post-conviction motions would only give the district court jurisdiction to reconsider its denials of those motions. Petitioners in their present appeal do not challenge the denials of those motions, rather they argue that their initial sentences are invalid.

mandates in their direct appeals — which have been final for years — reveals that they are in essence arguing for the retroactive application of *Booker.* As a three-judge panel we are constrained from adopting their argument by our holding in *Cruz* that "*Booker* is not retroactive, and does not apply to cases on collateral review where the conviction was final as of the date of *Booker*'s publication." 423 F.3d at 1121. *See also King*, 419 F.3d at 1036. Moreover, our rejection of petitioners' request for the recall of our mandates is consistent with the positions adopted by our sister circuits. *See United States v. Saikaly*, 424 F.3d 514 (6th Cir. 2005) (denying motion to recall mandate based on *Booker* and noting similar decisions by other circuits); *United States v. Fraser*, 407 F.3d 9, 10-11 (1st Cir. 2005) (denying a petition for rehearing and noting that if a "mandate could be recalled merely based on *Booker*, that result would provide an avenue to escape the restrictions Congress has imposed on habeas review").

**[10]** We understand the argument that declining to recall our mandates amounts to denying relief under *Booker* to defendants whose direct appeals were final at the time that decision was rendered. We agree, however, with the Sixth Circuit's response that "[a]lthough the defendant may argue that there is an element of unfairness in this result, it is the same element found in any Supreme Court decision which announces a new rule applicable to criminal defendants with pending prosecutions or appeals, but which is not made retroactive to defendants whose cases are final." *Saikaly*, 424 F.3d at 518. We read our Ninth Circuit case law as being in accord with the Sixth Circuit's perspective that the "incremental change in the law as evidenced by *Apprendi, Blakely,* and *Booker* simply is not the type of unforeseen contingency which warrants recall of the mandate to permit yet another round of appellate review." *Id.*

Finally, we do not hold that relief would not be available in a particular case upon a showing of truly extraordinary circumstances and equities, but only that this is not such a case.

Petitioners have not proffered any evidence that they were uniquely impacted by the Guidelines or that there are any equities that distinguish them from other defendants sentenced before *Booker*. Rather, they point only to the trial judge's expressions of his displeasure with mandatory guidelines. The trial judge's perspective may have been somewhat vindicated by *Booker*, but it would be unfair to countless defendants and to numerous judges to base the retroactive application of a Supreme Court opinion on the degree to which a trial judge grumbled while enforcing the extant law.

## IV.

We affirm the district court's determinations that issuance of a writ of *audita querela* is not an available remedy in light of our opinion in *Valdez-Pacheco*, 237 F.3d at 1080, and that petitioners are not entitled to relief under 18 U.S.C. § 3582(c)(2) because the applicable sentencing range has not been lowered by the Sentencing Commission. We reject, however, the district court's suggestion that we might recall our mandates, thus allowing petitioners to seek resentencing in light of *Booker*. We have previously held that *Booker* is not retroactive, *Cruz*, 423 F.3d 1119, and petitioners have failed to make the type of individualized showing of extraordinary circumstances that might arguably distinguish them from other defendants sentenced under mandatory guidelines. The district court's denials of relief are **AFFIRMED**.

---

NOONAN, Circuit Judge, concurring in the judgment of the court:

Resolution of this appeal turns on how the constitution is conceived to be. For some, the constitution is an unchanging document, speaking now as it did in 1789 except for such amendments as have been duly added to it. The paper and ink

of the old document have not altered; neither has its meaning. Stability is the bedrock of our government of laws.

What happens when the Supreme Court, as it not infrequently does, gives a new interpretation of the constitution, overruling an earlier interpretation? From the perspective just outlined, the new interpretation must be seen as a correction. A mistaken reading of the constitution has been replaced. The true meaning, now recovered, must have been the meaning the document always had. From this perspective, the petitioners in this case were sentenced under a system now recognized as constitutionally flawed. As the true meaning of the constitution has now been discovered, the petitioners should be able to be sentenced under the constitutionally correct system. As the constitution doesn't change, the new system was the only constitutional system at the time of their sentencing. It is unjust to hold them incarcerated under unconstitutional law.

This analysis has some intuitive appeal. A counter example may suggest that there is something wrong with it. Suppose the penalty for securities fraud is ten years. A man is sentenced to that term. Subsequently, the statute is changed; the penalty becomes five years. Is it unjust to keep beyond five years the man already sentenced to ten? No. When he committed the crime that was the lawful sentence. The new statute does not retroactively reduce his punishment.

Why does this example seem clear and the constitutional case cloudy? It is because of the belief that the constitution, unlike a statute, does not change. Therefore, a new reading of the constitution is necessarily restorative and retroactive. The new reading is what the constitution always said. But perhaps this response rests on a basic mistake. It is my contention that it does.

The mistake is to think of the constitution speaking. The original document is as silent as the paper on which it is writ-

ten. It is not what speaks. It is the interpreters of the constitution who speak. It is they who give it life and power. In our system of law, the authoritative interpreters are the justices of the Supreme Court. It is their voices that say what the constitution says.

Interpreters of this kind do not have the passivity of paper or the stability of stone. They change as generations change, as the times change, as mores mutate, as new circumstances, needs, and problems arise. Other times, other oracles. Interpreters of this kind are never going to give forever the same meaning to every constitutional text. And they don't.

As put by Chief Justice Roberts, albeit with the particular sharpness of a dissent, "a dog's breakfast of divided, conflicting, and ever-changing analyses" may be held by the majority to be "clearly-established law." *Abdul-Kabir v. Quarterman*, 127 S. Ct. 1654, 167 L. Ed. 2d 585 (2007). Chief Justice Roberts went on to observe:

> After all, today the author of a dissent issued in 1988 writes two majority opinions concluding that the views expressed in that dissent actually represented "clearly established" federal law at that time. So there is hope yet for the views expressed in *this* dissent, not simply down the road, but *tunc pro nunc*. Encouraged by the majority's determination that the future can change the past, I respectfully dissent.

Of course the constitution changes its meaning with changing majorities. Not as frequently as statutes are changed by legislators, the old foundational document has its speech altered by new authorized interpreters. The Supreme Court is the engine and champion of constitutional change.

In terms of this analysis, the petitioners here were sentenced under a system that was in accordance with the constitution when they were sentenced. It is no more unjust to them

to keep them confined under the old system than it would be to keep in prison the man sentenced to ten years when the penalty later becomes five. The crime committed at a given date is penalized under the law in force at that date. No injustice is done.

The Supreme Court has recognized two exceptions to the general rule that the constitution speaks as of the time the Supreme Court gives it a meaning: (1) cases where the new decision of the Supreme Court means that earlier conduct of the prisoners would not have been criminal if the new reading had been in place; and (2) cases where the new reading substantially improves accuracy in the determination of guilt. *Teague v. Lane*, 489 U.S. 228 (1989). The exceptions establish that the Supreme Court has the power to make its reading of the constitution retroactive. The exceptions do not establish that as a matter of justice the Supreme Court must act retroactively — only that there are cases where it is wise and equitable to do so. The instant cases may deserve such equitable and wise treatment. It is not given to us to make it available.

Judge Pregerson eloquently expresses reasons why such retroactivity would be good here, and he offers an escape from a rigid rule of nonretroactivity. Judge Bryan, the district judge who sentenced the petitioners, made clear statements of his belief in the unconstitutionality of the system with which he was compelled to comply. Far from grumbling, Judge Bryan's statement showed legal perspicacity and prescience and reflected sound judgment and an active conscience. Judge Pregerson, recognizing these values in what Judge Bryan did, finds in them the extraordinary circumstances that would permit this court to withdraw its mandates.

The strength of Judge Pregerson's position must be acknowledged. It is humane, and humaneness is a necessary quality in humans who are judges. The panel has the power to do what he asks. The panel does not have the authority.

Only the Supreme Court has both the power and the authority to create a rule of retroactivity when a new rule of constitutional law, if applied retroactively, would lessen the penalty given.

For the reasons stated, I concur in the judgment of the court.

---

PREGERSON, Circuit Judge, concurring in part and dissenting in part:

Once in 1990 and again in 1998, U.S. District Judge Robert J. Bryan of the Western District of Washington imposed multiple-decades-long sentences on defendants at a time when the United States Sentencing Guidelines's constitutionality was accepted. At the time he imposed those sentences, he stated in open court that both Guidelines sentences were, in his view, unjust and unconstitutional. In 2005, the Supreme Court in *Booker v. United States*, 543 U.S. 220, vindicated Judge Bryan's view that the mandatory Guidelines were unconstitutional. Now Judge Bryan, still troubled years later by the Guidelines sentences imposed in these two cases, implores us to allow him to redress the injustices inflicted on both men by recalling our mandates in their appeals so that Judge Bryan may re-sentence them to a just and constitutional sentence. I believe that these two cases present extraordinary circumstances as required by *Calderon v. Thompson*, 523 U.S. 538, 550 (1998) (holding that "the power [to recall the mandate] can be exercised only in extraordinary circumstances"); and accordingly, I would recall our mandates and remand for re-sentencing.[1]

---

[1] I join Parts I and II of Judge Callahan's opinion.

## I.  ADDITIONAL FACTUAL BACKGROUND

In 1990, District Judge Bryan sentenced Craig Carrington pursuant to the then-mandatory Sentencing Guidelines. After calculating the appropriate Guidelines range, Judge Bryan determined that, under the Guidelines, a downward departure was not warranted. Before he imposed sentence, Judge Bryan, moved by his conscience, told Carrington:

> You know, let me just say something, I guess, for the record or the benefit of people that are interested.
>
> I hear the plea all the time from defense lawyers . . . that the guidelines are not fair as applied to an individual case and there ought to be a different result . . . . I'm stuck with bad law and criminal defendants are stuck with bad law and the rest of society is stuck with bad law. . . . And I feel frustrated by these long sentences. It's contrary to the idea that one can pay a penalty for a crime and put it behind them within a reasonable time. . . .
>
> I have been sentencing felons for 21 years, and in the last couple of years I'm faced with these guidelines, and it's very frustrating because it has diminished my responsibility and my authority. But the reason for these guidelines is to do exactly that. That is, to diminish the judge's discretion. I think that I must, if I am to do my job right, I've got to find the facts as I find them and apply the guidelines, being the law, to those facts . . . .

Judge Bryan, constrained by the Guidelines, then imposed a sentence of 324 months imprisonment — the low end of the applicable Guidelines range.

The injustice of these harsh Guidelines sentences continued to frustrate and trouble Judge Bryan. In 1998, when Judge

Bryan sentenced Robert Tillitz, the judge before imposing sentence stated:

> It might interest you to know, Mr. Tillitz, that I ruled in this court a long time ago that it was my opinion that these guidelines were contrary to the United States Constitution. That issue has been laid to rest contrary to my view by the United States Supreme Court. So these guidelines, in spite of your view on the legality of them and my view on it, they are part of the law of the land that bind me and I must follow that.

Judge Bryan then sentenced Tillitz to 360 months imprisonment — the low end of the applicable Guidelines range.

After the Supreme Court decided *Booker v. United States*, 543 U.S. 220 (2005), Judge Bryan again demonstrated that Carrington's and Tillitz's cases continued to trouble him. When Carrington and Tillitz each brought petitions to modify their sentences, Judge Bryan turned down their requests. Rather than leave it at that, Judge Bryan took the extraordinary — indeed, unprecedented — measure of considering *sua sponte* whether recall of the mandate would be appropriate.

Judge Bryan observed that our court has authority to recall the mandate under *United States v. Crawford*, 422 F.3d 1145 (9th Cir. 2005) (recalling the mandate where the district court had expressed reservations about fairness of the defendant's sentence at the defendant's sentencing hearing), and that Judge Bryan's express reservations about Carrington's and Tillitz's sentences sufficed to distinguish those cases from *United States v. King*, 419 F.3d 1035 (9th Cir. 2005) (order) (declining to recall the mandate because of *Booker* error alone). As Judge Bryan also commented, it was only by an "accident of timing" that *Blakely v. Washington*, 542 U.S. 296 (2004) (holding that a state mandatory sentencing guidelines regime violated the Sixth Amendment) had not been decided

before our court issued the mandate in Carrington's and Tillitz's appeals.

## II.  EXTRAORDINARY CIRCUMSTANCES

We have inherent authority to recall the mandate to "prevent injustice." *Zipfel v. Halliburton Co.*, 861 F.2d 565, 567 (9th Cir. 1988) (quoting *Aerojet-Gen. Corp. v. Am. Arbitration Ass'n*, 478 F.2d 248, 254 (9th Cir. 1974)); *see also Verrilli v. City of Concord*, 557 F.2d 664, 665 (9th Cir. 1977) (per curiam). I agree with Judge Callahan that we may only recall the mandate "in extraordinary circumstances." *Calderon v. Thompson*, 523 U.S. 538, 550 (1998). For the reasons stated below, this case presents extraordinary circumstances that require us to exercise our discretionary authority to recall the mandate to prevent injustice.

### A.  District Court's Comments at Sentencing

In *Crawford*, we outlined a situation where a sentence violating *Booker* may warrant recall of the mandate even though *Booker* is not retroactive. There, we found two grounds for recalling our mandate. We stated in *Crawford*:

> This case involves "extraordinary circumstances" sufficient to justify our recall of the mandate because: (1) the sentencing judge expressed explicit reservations on the record about the sentence required under the previously mandatory Sentencing Guidelines; and (2) the Supreme Court's decision in [*Blakely*], foreshadowing its holding in [*Booker*], was rendered before the mandate issued.

*Crawford*, 422 F.3d at 1145-46 (internal citations omitted).[2]

---

[2]In *Crawford* we emphasized that these are not the only circumstances that support recall of the mandate. Specifically, we cautioned:

*Crawford* recognized that while the existence of *Booker* error is not, by itself, sufficient to recall the mandate, *see King*, 419 F.3d at 1036, *Booker* was nevertheless an extraordinarily important decision that, when combined with other factors, may warrant recall of the mandate.

Applying *Crawford*, it is clear that the two cases before us are "exceptional case[s] requiring recall of the mandate[s] in order to prevent an injustice." *See Verrilli*, 557 F.2d at 665. Like District Judge William Nielsen of the Eastern District of Washington in *Crawford*, Judge Bryan expressed his frustration with the lack of discretion afforded to district court judges by the Guidelines when he sentenced Carrington and Tillitz. If anything, Judge Bryan's expressed concerns at Carrington's and Tillitz's sentencing hearings were even stronger than Judge Nielsen's concerns in *Crawford*. In *Crawford*, Judge Nielsen complained that the sentencing ranges were "extraordinarily high," but — at least according to the facts provided in *Crawford* — Judge Nielsen did *not* claim that the mandatory Guidelines were themselves unjust and unconstitutional. *See* 422 F.3d at 1146 n.1. Here, however, Judge Bryan challenged both the severity of the sentencing ranges *and* the constitutionality of the mandatory Guidelines when he sentenced Carrington and Tillitz.

That Judge Bryan made these statements at a time when the Guidelines were firmly entrenched only makes his remarks

> [I]n stressing that our decision here rests on both the sentencing judge's expressed misgivings about the sentence required by the mandatory Guidelines as well as the relative timing of the Supreme Court's *Blakely* decision and the termination of our appellate jurisdiction, we do not suggest that these same elements must always be present in order for a mandate to be recalled. Rather future panels will necessarily evaluate the existence of "extraordinary circumstances" warranting the recall of a mandate based on the facts of their individual cases.

*Id.* at 1146 n.2.

more extraordinary. The year before Judge Bryan sentenced Carrington, the Supreme Court upheld the Sentencing Commission's authority to promulgate mandatory sentencing guidelines. *See Mistretta v. United States*, 488 U.S. 361, 412 (1989). Nevertheless, Judge Bryan's words at Carrington's sentencing presaged the fault the Supreme Court found with the Guidelines in *Booker*: that the Guidelines unconstitutionally "diminish[ed] the judge's discretion" to sentence the defendant to an appropriate sentence, and required the judge to "find the facts . . . and apply the [G]uidelines, being the law, to those facts."

By the time Judge Bryan sentenced Tillitz, the Supreme Court had repeatedly reinforced the validity of mandatory sentencing guidelines, *see, e.g., Stinson v. United States*, 508 U.S. 36, 42 (1993), and *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000) (holding that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt"), was not yet on the horizon. Yet Judge Bryan continued to criticize the Guidelines's constitutionality and their constraint on his ability to give Tillitz a just sentence.

Judge Callahan believes that Judge Bryan's statements at the time of both Carrington's and Tillitz's sentencing are not enough to recall the mandate. In so deciding, the majority erroneously assumes that *Crawford* held that a district judge's express reservations at sentencing are not enough to justify recall of the mandate. To be sure, *Crawford* did point out the existence of *two* extraordinary circumstances justifying relief. *Crawford* did not hold, however, that either factor was alone insufficient to justify recall of the mandate. Rather, in *Crawford* we merely noted that there were two special circumstances present in that case, and that those factors together sufficiently distinguished *Crawford* from *King. See id.* at 1145-46 & n.2. *Crawford* certainly does not compel Judge Callahan's conclusion that neither of the two factors identified

in *Crawford* can alone be sufficient to recall the mandate. Moreover, Judge Callahan's position creates considerable tension with *Crawford*'s admonition that "future panels will necessarily evaluate the existence of 'extraordinary circumstances' warranting the recall of the mandate *based on the facts of their individual cases*." *See id.* at 1146 n.2 (emphasis added). Thus, I would not hold that we may not recall the mandate solely because only one of the *Crawford* factors is present.

## B. District Court's *Sua Sponte* Request that We Recall the Mandate

In any event, there is also an additional circumstance not present in *Crawford* that compels our attention — Judge Bryan's impassioned plea to this court. Even though the parties did not raise the issue and Judge Bryan lacked authority to recall the mandate, he nevertheless implored us to recall our mandates. Judge Bryan told us:

A Sentencing Guidelines scheme was adopted by Congress and implemented by the United States Sentencing Commission on November 1, 1987. Many judges, including the undersigned, believed that the Sentencing Guidelines were contrary to the requirements of the U.S. Constitution. Nevertheless, the Supreme Court, in its wisdom, found that the guidelines passed constitutional muster.

Many defendants, including Mr. Tillitz and Mr. Carrington, were sentenced under the mandatory guidelines scheme, and many, including Mr. Tillitz and Mr. Carrington, are still incarcerated under mandatory guideline sentences . . . .

During the period of the guidelines' mandatory life —1987 to 2005—judges, like the undersigned, did their best to apply the law, assuming the constitu-

tionality of the guidelines, and often sentencing defendants to sentences that were inappropriate under any law or theory of sentencing except the guidelines. District judges, in other words, tried to follow the law, even if it appeared to lead to injustice.

Now, under *Booker*, it is clear that the guidelines sentencing scheme was unconstitutional all along. It follows that defendants, still incarcerated under an unconstitutional sentencing scheme, would seek resentencing, even knowing that, on resentencing, longer sentences might be imposed. Yet, because of retroactivity rules, defendants serving unconstitutional sentences are offered no relief, no remedy, and no justice.

Trial judges, more than anything, want to do the right thing. We understand our obligation to follow the law, but deeply-and even desperately-hope that the law will lead to justice. If we are part of an injustice, we want to set it right, even if it involves a great deal of extra work. To quote Gerry Spence:

> [S]ometimes a judge doesn't know how to get justice. . . . [T]he judge has to just sit up there and watch justice fail right in front of him, right in his own courtroom, and he doesn't know what to do about it, and it makes him feel sad. . . . Sometimes he even gets angry about it.

Gerry H. Spence, *Of Murder and Madness: A True Story*, 490 (1983).

This judge, sad and a little angry, would welcome an opportunity to resentence these defendants to a constitutional and legal sentence.

*Tillitz v. United States*, 2005 WL 2921957, at \*12-\*13 (W.D. Wash. Nov. 3, 2005) (order) (internal citations omitted).

When considered in tandem with the district court's statements at Carrington's and Tillitz's sentencing hearings, Judge Bryan's impassioned statement demonstrates that the circumstances of this case are exceptional. *Booker* restored the role of the district court judge as the person uniquely suited to consider all the circumstances surrounding a criminal defendant and to fashion a sentence most just and appropriate for that individual. These two cases have weighed on Judge Bryan's conscience for sixteen years (Carrington) and eight years (Tillitz). His conscience compelled him to *sua sponte* request that this court recall its mandates and allow him to assume the additional responsibility involved in re-sentencing these two defendants.

Judge Callahan dismisses the importance of this factor because, as she sees it, Judge Bryan merely "grumbled while enforcing the extant law." *Ante*, at 12135. This, however, rejects Judge Bryan's comments too hastily. Because Judge Bryan was best positioned to determine whether the mandatory Guidelines's constraints were extraordinarily harsh in a given case, we should put great stock in the fact that Judge Bryan tells us that Carrington and Tillitz were *particularly* worthy of resentencing.

In addition, Judge Bryan's statements provide great assurance that the constitutional error in both Carrington's and Tillitz's sentences was not harmless. In *Calderon*, the Supreme Court rejected our claim of extraordinary circumstances because the mistake at issue — the failure of two judges out of thirty-five to make a timely request for a vote on whether to rehear a case en banc and thus "contribute their views to a determination that had been given full consideration on the merits by a panel of the court" — was relatively unlikely to have affected the appellant's rights. *See Calderon*, 523 U.S. at 551. Unlike *Calderon*, here we know that a different sen-

tence would likely result had the district judge been permitted to impose a constitutional sentence.

Judge Bryan, exercising caution, unsurprisingly acknowledged that he cannot promise that Carrington's and Tillitz's sentences would be different upon re-sentencing. *See Tillitz,* 2005 WL 2921957, at *12 ("These sentences may have been appropriate at the time they were imposed, or they may not have been."). Nevertheless, his statements at sentencing, the fact that he gave each defendant the lowest sentence possible within the applicable Guidelines range, and his subsequent suggestion to us that we recall the mandates provides a level of confidence that harmful error occurred here that will not be true in many other cases, if any.

## C.   Lapse of Time

Judge Callahan makes much of the fact that the second basis for recalling the mandate identified in *Crawford* — that *Blakely* had been decided when the mandate in Crawford's appeal issued — is not present. As Judge Bryan aptly noted, however, that second basis is not present purely by the "accident of . . . timing." *See Tillitz*, 2005 WL 2921957, at *11. In *Crawford*, moreover, we emphasized that this combination of circumstances was not the only one that would justify recalling our mandate. *See Crawford*, 422 F.3d at 1146 n.2 ("[W]e do not suggest that these same elements must always be present in order for a mandate to be recalled."). Rather, we are to look at whether extraordinary circumstances exist based "on the facts of [defendants'] individual cases." *See id.*

Rather than follow the express statements in *Crawford*, Judge Callahan chooses to adopt an unduly crabbed reading of the case. Judge Callahan would rely on what it terms a "unique question of timing" in *Crawford* and would only permit recall of the mandate where a sentence is not yet final. She gives no reason, however, why the mandate can never be recalled after the time for filing a petition for certiorari has

expired. Indeed, to do so would essentially return us to the long-abandoned rule that our power to recall the mandate expires at the end of the court's term. *See Aerojet-Gen.*, 478 F.2d at 254 n.6; *see also* 16 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice & Procedure* § 3938 (2d ed. 1996). Moreover, Judge Callahan's effective imposition of a ninety-day time limit fails to recognize that time is but a *factor* affecting the decision whether to recall the mandate, and not a rigid constraint. *See Patterson v. Crabb*, 904 F.2d 1179 (7th Cir. 1990) (noting that the power to recall the mandate is not limited by time); *Aerojet-Gen.*, 478 F.2d at 254 n.6 (explaining that "the lapse of time [is] significant only with respect to the court's duty to 'prevent injustice.' " (quoting *Greater Boston Television Corp. v. FCC*, 463 F.2d 268, 277 (D.C. Cir. 1972))). I read *Crawford*'s second factor as nothing more than a recognition that the lapse of time is always a factor in determining whether to recall the mandate.

Judge Callahan, relying on *United States v. Cruz*, 423 F.3d 1119 (9th Cir. 2005) (per curiam), also suggests that recall of the mandate is inappropriate because *Booker* is not retroactive. I agree that *Cruz* holds that *Booker* is not retroactive to cases on collateral review, but that is *all* that *Cruz* holds. Contrary to Judge Callahan's assertion, *Cruz* does not limit *Crawford*'s holding. To say that *Booker* is not generally retroactive under *Teague v. Lane*, 489 U.S. 288 (1989), is not to say that equity may *never* demand that we provide relief to a defendant whose sentence would be unconstitutional under *Booker* when special circumstances suggest that failure to do so would result in a grave injustice. That is why *Booker* error alone was not enough to warrant recall of the mandate in *King*, but *Booker* error in addition to other extraordinary circumstances permitted recall in *Crawford.* The decisions of our sister circuits are not to the contrary. *See United States v. Saikaly*, 424 F.3d 514, 517-18 (6th Cir. 2005) (refusing to recall the mandate for *Booker* error alone); *United States v. Fraser*, 407 F.3d 9, 11 (1st Cir. 2005) (same); *United States v. Ford*, 383 F.3d 567, 568 (7th Cir. 2004) (same).

Unlike Judge Callahan, I believe that the circumstances involved in Carrington's and Tillitz's cases — the judge's strong reservations at the time of sentencing and the judge's sua sponte plea for relief from our court — are both unusual and extraordinary. In addition, I do not agree that the absence of the second factor identified in *Crawford* precludes relief.

## III.  FINALITY

At its heart, the majority opinion rests on a concern that a contrary decision would undermine the finality of judgments. I agree that finality is an important value. It is not, however, the only relevant consideration. When the injustice is sufficiently great, we should not allow our concerns with repose to obviate our obligation to do justice.

Granting relief would place only a limited burden on the interests underlying finality. In *Calderon*, the Court placed a very high value on repose because recall of the mandate threatened "to frustrate the interests of a State . . . in enforcing a final judgment in its favor." *See* 523 U.S. at 552. Unlike *Calderon*, however, we deal here with *federal* convictions. And although there is a weighty interest in finality because it "is essential to both the retributive and the deterrent functions of criminal law," *see id.* at 555, that interest is not absolute. The interest in repose is lessened all the more because we deal not with finality of a *conviction*, but rather the finality of a *sentence.* There is no suggestion that Carrington or Tillitz be set free or that the government be forced to retry these cases. The district court asks only for an opportunity to re-sentence in accordance with the Constitution.

Of course, another interest underlying finality is judicial efficiency: "the interests of stable adjudication and judicial administrative efficiency, on which growing caseloads place a growing premium." *Calderon,* 523 U.S. at 569 (Souter, J., dissenting). Implicit in the majority's opinion is a concern that a contrary decision would open the floodgates of litigation.

On closer examination, however, this concern proves baseless.

Cases where a district court expresses reservations about the validity of a Guidelines sentence are rare. *See United States v. Labrada-Bustamante*, 428 F.3d 1252, 1262 (9th Cir. 2005) (describing such cases as "rare"). As Tillitz observes in his response to the government's petition for rehearing, only two decisions — both by district courts — have cited Judge Bryan's decision in Tillitz, and neither relied on the language seeking recall of the mandate. *See United States v. Scott*, Criminal Action No. 5:02CR47, 2006 WL 3488932 (N.D.W. Va. Aug. 10, 2006); *United States v. Gettings*, No. CR. S-00-535 WBS, 2006 WL 1795112 (E.D. Cal. June 28, 2006). A WESTLAW search reveals that only five cases citing our first decision in this case, 470 F.3d 920 (9th Cir. 2006) (*Carrington I*), involved attempts to recall the mandate or seek re-sentencing on *Carrington I*'s authority. None of these cases appear to involve facts similar to those in *Crawford* or this case, and the courts in all four cases rebuffed the request for re-sentencing. *See United States v. Blankenship*, No. 06-36039, 2007 WL 1742483 (9th Cir. June 14, 2007) (unpublished memorandum); *United States v. Woodruff*, No. 93-0438, 2007 WL 2123735 (N.D. Cal. July 23, 2007); *United States v. Velarde*, No. 89-CR-50009-MJR, 2007 WL 853983 (S.D. Ill. Mar. 16, 2007); *Dillon v. Smith*, No. 1:07-CV-00118 AWI SMS HC, 2007 WL 781455 (E.D. Cal. Mar. 13, 2007); *United States v. Walker*, No. 96-cr-40094-JPG, 2007 WL 458201 (S.D. Ill. Feb. 7, 2007). Moreover, I am aware of no appellate decision — published or unpublished, in any circuit — that involves recall of the mandate for *Booker* error in circumstances even remotely similar to those in *Crawford* and this case.[3]

---

[3]Tillitz's response to the government's petition for rehearing provides a mostly comprehensive list of cases addressing recall of the mandate for *Booker* or *Blakely* error. None of the cited cases have facts similar to either *Crawford* or this case.

*Crawford* has been on the books for nearly two years, and yet this case is the only one nationwide that appears to raise similar facts. Permitting the district court to re-sentence would place only a limited burden on the government given the unusual circumstances involved. Finality is important, but I fear the majority is too willing to let repose triumph over justice.

## IV.   CONCLUSION

I would recall the mandates in Carrington's and Tillitz's appeals. Judge Bryan stated at their sentencing hearings that he believed their sentences were unconstitutional and unjust. Years later, Judge Bryan singled out these two men as individuals to whom the constraints of the old mandatory Guidelines caused particular harm. While I recognize that the passage of time has somewhat cemented the government's interest in finality, that interest is still not so strong that I would deny a district court judge the opportunity to remedy what the judge considers to be an "injustice" and to re-sentence a defendant to a sentence that is just, proper, and constitutional. *See Gondeck v. Pan Am. World Airways, Inc.*, 382 U.S. 25, 26-27 (1965).[4] Accordingly, I dissent.

---

[4]Judge Callahan is also concerned that re-sentencing Carrington and Tillitz would be "unfair" to defendants for whom relief would not be available. On this point, I agree with Professor Douglas A. Berman, who, providing commentary on this very case, responded to this concern by suggesting that it represents, as Justice Brennan once put it, a "fear [of] too much justice." *See* Sentencing Law & Policy, http://sentencing.typepad.com/sentencing_law_and_policy/2006/12/what_wrong_with.html (Dec. 14, 2006); *see also McCleskey v. Kemp*, 481 U.S. 279, 339 (1987) (Brennan, J., dissenting).